UNITED STATES DISTRICT COURT

NORTHERN  DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| SHAWN LEE HILLER and STACEY HILLER | ) | No. C 05-1620 SBA |
| | ) | |
| Plaintiffs, | ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA and DOES 1 to 20 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.   Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Shawn Hiller worked for CHP for less than 6 months . . . . . . . . . . . . . . . . . . . . . . . . 2

III. The accident produced forces on Mr. Hiller's lower back less than forces he
     experienced in everyday activities, despite Mr. Hiller's description of it . . . . . . . . . . . 3

IV.  The experts agreed that Mr. Hiller sustained a soft tissue low back injury . . . . . . . . . . 5

V.   Adverse Credibility Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.   Mr. Hiller did not produce his writings about the accident, his condition or
          his activities after the accident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.   Mr. Hiller did not produce photographs of his Jeep on unpaved trails, despite
          a Court order requiring him to do so . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     C.   Shawn Hiller did not disclose his off-road driving activities . . . . . . . . . . . . . . 20

     D.   Shawn Hiller exaggerated his injury, his condition and his pertinent medical
          history to the doctors he saw after the accident . . . . . . . . . . . . . . . . . . . . . . . 25

          1.   Statements to doctors about the accident and the Jeep . . . . . . . . . . . . . 25

          2.   Statements to the doctors about his condition . . . . . . . . . . . . . . . . . . . 26

          3.   Undisclosed previous low back symptoms and unreliable medical
               history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     E.   Mr. Hiller's testimony regarding his ability to work was not credible . . . . . . . 29

          1.   Light Duty at CHP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          2.   Undisclosed work for Jeepers and Creepers . . . . . . . . . . . . . . . . . . . . 34

VI.  The medical evidence regarding Mr. Hiller's condition after the accident . . . . . . . . . . 37

VII. Damages Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     A. Medical Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     B. Lost Past Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     C. Lost Future Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

     D. Loss of pension claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

     E. General Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

     F. Loss of Consortium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

I.   Specific Items of Damages Claimed By Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . 61

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.     Medical Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

B.     Lost Past Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C.     Lost Future Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

D.     Lost future pension  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

E.     General Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

F.     Loss of Consortium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

G.     Future Medical Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

II.  Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

The trial of this matter commenced on March 5, 2007 before the Honorable Saundra B. Armstrong.  Having considered all of the evidence introduced at trial and the arguments made by counsel, the Court now issues its findings of fact and conclusions of law.[1]

## I.     Overview

This personal injury lawsuit arose from a motor vehicle accident on February 24, 2004 between a United States Postal Service vehicle and a 2004 Jeep Rubicon owned and driven by plaintiff Shawn Hiller, who at the time was a CHP patrolman driving his personal vehicle to a training class for his work for CHP (hereinafter, "the accident").  As a result of the accident, Mr. Hiller sought medical treatment over the following three year period leading up to trial and he applied for a retirement from the CHP based on a finding of permanent disability made by his treating physician.  In May 2006, CHP granted Mr. Hiller's request for disability retirement.

At trial, Mr. Hiller sought damages for medical expenses of $12,550.  He also sought lost wages covering a 25 year period, until 2029, based on his doctor's finding of permanent disability from his job at the CHP and a lost service-connected pension that would have accrued if he worked as a CHP patrolman for those 25 years.  He also sought substantial general damages, and his spouse, Stacey Hiller, sought damages for loss of consortium.

The Court finds that Mr. Hiller was not credible, when he provided pertinent information to the doctors, at his deposition, and at trial.  The Court finds that Mr. Hiller exaggerated the extent of his physical limitations, his complaints of pain, and the circumstances of the accident to the doctors he saw over the past three years.  The Court finds that Mr. Hiller also minimized or failed to inform the doctors of his preexisting degenerative back condition, his previous symptoms of low back pain, and the x-rays

---

[1] To the extent that any statement in the findings of fact makes any reference to the law, it shall be deemed as both a finding of fact and conclusion of law.  Similarly, to the extent that any conclusion of law includes any matter of fact, it shall be deemed to have been found by the court as both a finding of fact and conclusion of law.

from 2002 showing such condition.  The Court finds that those doctors relied on the erroneous information provided to them by Mr. Hiller and the incorrect assumption that abnormalities in the 2004 MRI of Mr. Hiller's back were not present before the accident in reaching their conclusions about his condition and treatment.  As a result, the doctors' conclusions, predicated as they are on inaccurate information Mr. Hiller provided about the severity of the accident and Mr. Hiller's physical condition before and after the accident, are not persuasive.  Mr. Hiller's lack of credibility weighs heavily against all claims made at trial by plaintiffs.

Because of these deficiencies in their evidence, explained more fully below, plaintiffs failed to carry their burden of proof on their damages claims, and the Court adopts the proposed award outlined below.

**II.      Shawn Hiller worked for CHP for less than 6 months.**

1.      Shawn Hiller was accepted by the California Highway Patrol ("CHP") in December 2002 and he graduated from CHP Academy in June 2003.  Trial Transcript (hereinafter, "TT") at 163:8-17.

2.      Mr. Hiller was then assigned to Redwood City CHP.  TT 165:1-5.

3.      After assignment to Redwood City, Mr. Hiller underwent a training period, which lasted three months, or until approximately September 2003.  TT 167:5-6.

4.      After completing the training period in approximately September 2003, Mr. Hiller began his work as a traffic officer working out of Redwood City.  TT 167:11-17.

5.      The accident at issue occurred less than six months later on February 24, 2004.  TT 167:18-19.

**III.      The accident produced forces on Mr. Hiller's lower back less than**

**forces he experienced in everyday activities, despite Mr. Hiller's description of it.**

6.   On February 24, 2004, a tractor trailer truck driven by United States Postal Service employee Reginald Jones struck Mr. Hiller's 2004 Jeep from behind in the slow lane of U.S. Highway 101, southbound, near the University Avenue overpass in East Palo Alto, California.

7.   Mr. Hiller's Jeep was stopped.  Mr. Hiller had his foot on the brake and was seat belted.  TT 181:2-7.  He was sitting in the driver's seat, facing the steering wheel, with his back against the seat back and his rear end flat against the seat bottom.  TT 342:6-343:9.  His seat belt worked properly. TT 343:23-24.

8.   Mr. Hiller has no personal knowledge of the speed of the postal vehicle at the time of impact with the Jeep.  TT 344:2-345:6.

9.   Mr. Hiller's expert Dean Tuft, Ph.D., testified at trial that the impact speed of the Postal Service truck was between 9.5 and 16 miles per hour.  TT 847:10-11; 853:5-11. To reach this conclusion, Dr. Tuft relied on Mr. Hiller's testimony that he had his foot on the brake of the Jeep at the moment of impact and maintained his braking, his Jeep was at a complete stop at the moment of impact, and the impact moved the Jeep forward one and one half car length.  TT 848:15-850:15, 852:5-22.

10.  Dr. Tuft concluded the damage to the Jeep was not consistent with an estimated impact speed for the Postal Service truck of 35 to 40 miles per hour.  TT 853:16-20.  Dr. Rajeev Kelkar, defendant's expert in biomechanical engineering and accident reconstruction, agreed with Dr. Tuft and testified the damage to the Jeep was not consistent with impact speeds of between 20 and 40 miles per hour.  TT 1014:1-10.

11.  Mr. Hiller's Jeep sustained damage in the collision.  Plaintiff's Exhibit 10.

3

12. Dr. Tuft testified on direct that Mr. Hiller's seat back was damaged in the accident, based on photographs and the repair estimate. TT 844:7-25. On cross examination, however, Dr. Tuft admitted he was told by Mr. Hiller that the driver's seat was damaged in the collision. TT 858:11-16. But when asked on cross-examination, Dr. Tuft could not find any reference to the driver's seat on the repair estimate. TT 857:3-858:13.

13. Furthermore, Dr. Tuft testified on direct that the front bumper of the Postal Truck went under the Jeep's rear tire assembly to strike the Jeep's bumper. TT 845:14-846:2. However, on cross-examination, Dr. Tuft conceded that the front bumper of the Postal Truck was flush, not protruding, and that the Jeep's rear tire assembly extended 11 ½ inches to the rear of the Jeep's rear bumper, was the most rearward piece of equipment on the Hiller Jeep, and was the most likely point of first contact on the Jeep in the accident. TT 859:20-861:23.

14. Dr. Rajeev Kelkar, defendant's accident reconstruction and biomechanical expert, agreed and explained that the Postal Service truck did not collide with the Jeep's rear bumper in the accident. TT 1051:1-1054:25.

15. Dr. Kelkar testified that the impact speed of the Postal Service truck was between 4 and 12 miles per hour. TT 1012:21-23.

16. Mr. Hiller drove his Jeep away from the scene of the accident, to the CHP Redwood City office, reaching speeds he estimated at 35-40 miles per hour. TT 343:25-344:1; 345:18-20, 574:15-22.

17. Mr. Hiller's Jeep was not totaled in the accident.

18. Superior Body Shop repaired the Jeep and returned it to Mr. Hiller on April 12, 2004. TT 352:16-23; Plaintiff's Exhibit 10 at page 519.

19. By the time Mr. Hiller received the Jeep from Superior Body Shop, he had already contacted his attorney, Kevin Morrison. TT 491:18-21.

4

**IV.    The experts agreed that Mr. Hiller sustained a soft tissue low back injury.**

20.    Shawn Hiller had degenerative disc disease.  TT 375:18-21 [Jones], 416:1-25 [Jones], 442:18-444:7 [Harrington], 615-17, 631:4 [Sutro].

21.    Mr. Hiller's degenerative disc disease preexisted the accident.  TT 417:1-21 [Jones], 442:18-444:7 [Harrington], 616:25-617:5, 631:7 [Sutro].

22.    In the accident, Mr. Hiller received a soft tissue injury in the area of his lumbar spine.  TT 439:7-10 [Harrington]; TT 615:22-616:18, 631:14-15 [Sutro].

23.    Most soft tissue injuries heal within a few months.  Orthopedic Surgeon Dr. Harrington testified Mr. Hiller's injuries healed within four weeks. TT 452:1-4.  Orthopedic Surgeon Dr. Sutro testified that "95% heal within a year" in reference to soft tissue injuries.  TT 631:19.  Orthopedic Surgeon Dr. Lang testified that 95% of patients with back pain heal within 90 days.  TT 729:16-20.

24.    No physician ever found any objective abnormalities in examining Mr. Hiller at any time.  TT 440:2-14.  None of the physicians ever found a neurological deficit or injury to Mr. Hiller.  TT 440:15-442:5 [Harrington]; 612:16-613:10, 631:8-13 [Sutro]; 699:19-21 [Stark], and 732-33 [Lang].  Neither Dr. Harrington nor Dr. Sutro found any physical asymmetry or atrophy when examining Mr. Hiller.  TT 434-35 [Harrington], 612:19-20 [Sutro].

25.    The physicians who testified for Mr. Hiller concluded that Mr. Hiller's symptoms of pain in his lumbar spine started after the February 2004 accident, based on the history provided by Mr. Hiller, were caused by the accident, and were incapacitating and disabling, permanently.  The doctors credited Mr. Hiller's historical statements that his lumbar spine became symptomatic after the accident, as a result of the accident, and there were

no other events or activities in his life after the accident that could have caused such pain.  TT 617:6-15, 632:5-14 [Sutro]; TT 655:1-656:3 [Stark]; TT 739:19-740:2 [Lang].

26.    Mr. Hiller's treating physician, Dr. Stark, and his retained orthopedic surgeon expert, Dr. Sutro, both agreed Mr. Hiller does not need any invasive treatment, including surgery, in the future.  TT 628:14-629:5 [Sutro], 687:9-10 and 704-05 [Stark].

**V.    Adverse Credibility Findings**

**A.    Mr. Hiller did not produce his writings about the accident, his condition or his activities after the accident.**

27.    Shawn Hiller did not produce relevant documents, requested of him during discovery, to the United States, which found the on-line writings and introduced them into evidence, over objection at trial.  Mr. Hiller's writings contradict his claim that he experienced incapacitating and disabling pain as a result of the accident.

28.    When asked at his deposition in November 2005 if he made any writings about the accident, his injuries or his everyday activities, Mr. Hiller did not inform the defendant about his web postings at jeepforum.com.  TT 523:21-25.

29.    Mr. Hiller's deposition testimony was read into evidence:

Q.  Okay.  Are there any writings that you
have made that either describe the incident
or the    injuries you experienced or your
day-to-day experiences as a result of those
injuries --

MR. MORRISON:  Object to the form.

BY MR. LEE: Q.   -- that you can think of

6

other than what's already been produced?

MR. MORRISON:  Object to the form.  Go
ahead.

THE WITNESS:  Other than what's already
been produced, to my recollection, no.

BY MR. LEE: Q.   You understand I'm just
trying to make sure that I've reached the
limit of documentation in the case because
that's important for my side.

A.  Yes, sir.

Q.  So I'm not suggesting that you should
have any of this stuff.  I'm just simply trying
to find out if you do.  So we're clear, I've got
the documents that have been produced, and
I'm asking if there's anything that you've
written about this accident and your injuries
in addition to that that you can think of.

A.  Yes, sir, I understand, and to my recollection,
no.

TT 525:1-25 [11/30/05 deposition transcript at 25:4-26:4].

30.    Mr. Hiller was under a court order in June 2006 to produce all relevant
electronic documents, which includes photographs, e-mails and the like,
from his computer hard drive.  TT 502:7-11.  The order was Exhibit JJJ at
trial.

31.    Mr. Hiller did not produce his jeepforum.com writings in discovery.
Exhibit YY, page 1, was a letter from Mr. Hiller's attorneys to the United
States Attorney's Office dated December 21, 2006, providing Mr. Hiller's

response to the Court's order reopening discovery.  TT 492:2-7.  The letter stated, in part: "Enclosed are the documents responsive to the court's Order Reopening Discovery dated December 8, 2006, Bate Stamped 000781 to 000929.  Many of the documents do not contain my client's postings, but contain the whole "thread" of discussion, in the same way you produced the jeep forum documents to me in late August...All photos of his Jeep are enclosed as well."  Exhibit YY, page 1 was received in evidence.  TT 493:21-22.

32.  At trial, Mr. Hiller confirmed that everything he produced regarding his off-road activity was in Exhibit YY.  TT 500:1-3.

33.  Mr. Hiller admitted at trial that he wrote web postings after the accident.  He wrote web postings on "jeepforum.com," "rubiconowners.com," and "rubiconownersofcalifornia.com."  To write his web postings, Mr. Hiller created a user identity and password at each website.  TT 256:16-258:1.

34.  Mr. Hiller admitted he wrote more than 700 web postings at jeepforum.com.  TT 522:19-21.  He wrote all of them after the accident.  TT 522:22-23.

35.  He described the accident in some of the 700+ web postings and stated he had been rear-ended at 40 miles per hour in the accident.  TT 522:24-523:4.

36.  He had a user identity of "one jeepbro" and he selected as his avatar a photograph of a man making an obscene gesture with his two hands in the direction of the camera.   TT 258:8-259:8.  Mr. Hiller testified that whenever "one jeepbro" and his avatar appear next to a message on jeepforum.com, he was the author of that message.  TT 258:2-259:5.

37.  Mr. Hiller was the author of the web posting at Exhibit VV-4, which was admitted into evidence.  TT 266:14-17.  In that web posting on April 4, 2004, Mr. Hiller stated: "Hey folks, New (sic) to the Form (sic) Today

8

(sic) and glad to be here (emoticon omitted)!  The question I have is this: I have a 3.5" Rubicon Express Litft (sic) on my 04 Rubicon TJ, and I already want to upgrade to the 5.5 0r 6 (I heard there is a 6" now?).  What does it take to upgrade?  Is it worth it to upgrade, or am I better just tearing it all out, E-baying it and buying the new system.  Which is more cost effective?  Any imput (sic) would be great, and much appreciated!"  Exhibit VV-4.  Mr. Hiller wrote this web posting about upgrading his Jeep less than six weeks after the subject accident, at a time when according to his testimony he told his doctor Joel Saal he was in constant, disabling lower back pain.  TT 353:17-354:4.

38.   Mr. Hiller was the author of the web posting at Exhibit VV-31, which was admitted into evidence.  TT 266:8-15.  In that web posting on May 25, 2004, Mr. Hiller stated: "I am in the market for a new front bumper and looking for any suggestions and pic's would be nice.  My Jeep is a part-time off roader, but very trail capable.  A Warn winch will be mounted on the bumper I buy.  Anyone got any neg or positive about the Poison Spyder trail stinger?  Do they come with light tabs?  Any info or pic's would be great (emoticon omitted)"  Exhibit VV-31.  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This web posting's reference to the Jeep as a "part time offroader" that was "very trail capable" in May 2004 is inconsistent with Mr. Hiller's claim at trial that he drove his Jeep off road a few times and at low intensity only.

39.   Mr. Hiller was the author of the web posting at Exhibit VV-40, which was admitted into evidence.  TT 272:7-10.  In that web posting on June 11, 2004,  Mr. Hiller stated in part: "Has anyone mounted their Hi-Lift Jack on the back of a Warn Rock Crawler Bumper W/Tire carrier?"  Exhibit VV-40.  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This web posting and

9

other writings by Mr. Hiller describing the lifted nature of his Jeep, and his desire to increase its lift, are inconsistent with his claim at trial that he was in disabling and incapacitating pain and did not enjoy full range of motion throughout his body during the time of the writings.

40.     Mr. Hiller was the author of the web posting at Exhibit VV-45, which was admitted into evidence.  TT 273:8-15.  In that web posting on June 23, 2004,  Mr. Hiller stated in part: "Anyone have any info positive or negative regarding the Avenger Supercharger?  Soon I will have the cash, and was looking for a power boost for my JEEP....I'm curious just how sturdy these things are, and what kinda life expectancy it has."  Exhibit VV-45.  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This web posting's reference to Mr. Hiller's desire to boost the power of his Jeep is inconsistent with his claim at trial that he only drove slowly and carefully when off-roading after the accident.

41.     Mr. Hiller was the author of the web posting at Exhibit VV-64, which was admitted into evidence.  TT 274:10-17.  In that web posting on July 11, 2004,  Mr. Hiller asked: "Has anyone been to Camp Jeep before?  I think for the first time this year, Camp Jeep is going to be on the westcoast (sic) (California) sometime in August (too lazy to get up and check the date)."  Exhibit VV-64.  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This web posting is probative of Mr. Hiller's interest in driving his Jeep for recreation after the accident, and traveling to distant places to go off-roading, and contradicts his claim at trial that he was in disabling and incapacitating pain, as he reported to his doctors throughout, as a result of the accident.

42.     Mr. Hiller was the author of the web posting at Exhibit VV-78, which was

admitted into evidence.  TT 275:12-19.  In that web posting on July 15, 2004,  Mr. Hiller stated in part, referring to a taillight system: "I just plan on installing them without any type of rocker corner pannel (sic)..."  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This web posting is probative of the fact that Mr. Hiller was able to make modifications to his Jeep at a time when he claimed he was in too much pain to work even light duty for the CHP.

43.   Mr. Hiller was the author of the web posting at Exhibit VV-80, which was admitted into evidence.  TT 276:17-23.  In that web posting on July 15, 2004,  Mr. Hiller stated: "What's work?  You mean workin on your JEEP isn't your day job (emoticon omitted).  Thanks, currently have my jeep taken apart in the driveway (apartment complex) that's why there's the sense of urgency!"  Exhibit VV-80.  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This writing reveals Mr. Hiller's ability to take his Jeep apart and make modifications to it, during a time when he claimed he was in disabling and incapacitating pain as a result of the accident.

44.   Mr. Hiller was the author of the web posting at Exhibit VV-105, which was admitted into evidence.  TT 278:6-22.  In that web posting on August 15, 2004,  Mr. Hiller stated in part: "Part of living is taking a risk, whether it be small or big.  That's why we go 4x4-ing with the top of our jeep, no sunblock, in teh middle of nowhere, right?"  Exhibit VV-105.  Mr. Hiller testified that "4x4-ing" was a reference to four-wheel driving.  TT 278:4-5.  Mr. Hiller admitted on cross examination that he drove his Jeep off road during this time period.  TT 544:13-19.  This is probative of Mr. Hiller's continuing interest in the activity of off-roading and the reasons for that interest, namely risk-taking, which contradicts the claim Mr. Hiller made at trial that off-roading is no different than driving a vehicle

on city streets and Mr. Hiller only went off roading at low risk, low intensity levels.

45. Mr. Hiller was the author of the web posting at Exhibit VV-118, which was admitted into evidence. TT 279:21-280:3. In that web posting on October 4, 2004, Mr. Hiller stated: "I'm considering the ARB (bumper) for a couple of reasons. First, Protection. Second approach angle. I know there are other bumpers that are shaped a little better in regards to the approach angle, but I want maximum protection." Exhibit VV-118. Mr. Hiller testified that "approach angle" applied to the activity of four-wheel driving, and when driving on a paved road, he was not worried about the "approach angle" of his Jeep's bumper. TT 279:15-20. This web posting confirms that Mr. Hiller modified his Jeep to protect against off-road obstacles, such as uneven terrain and rocks, which contradicts his claim that he never engaged in any jarring off roading after the accident.

46. Mr. Hiller was the author of the web posting at Exhibit VV-163-164, which was admitted into evidence. TT 282:20-283:8. In that web posting on November 12, 2004, Mr. Hiller described the installation of a dual battery system he obtained from his friend James at Jeepers and Creepers, which gave his Jeep an extra 4 amps, and he described a test he conducted using his Jeep's winch. He stated in part: "I look forward to many more tests out in the off-road world, and will keep you all posted on further updates as I go along! A big thanks to James at Jeepers and Creepers for letting me experiment with his new product. Look for it very soon!" Exhibit VV-164. This web posting reveals Mr. Hiller's active interest in driving off-road, during a period when he testified he was in disabling and incapacitating pain that prevented him from working even light duty for the CHP. Its reference to testing Jeep-related products in the "off road world" also contradicts Mr. Hiller's claim he only engaged in off-roading at low intensity levels.

47.     Mr. Hiller was the author of the web posting at Exhibit VV-205 and VV-206, which was admitted into evidence.  TT 286:1-10.  In that web posting on December 17, 2004,  Mr. Hiller stated: "Did this mod a couple of weeks ago, but just thought I (sic) throw up some pic's available front diff guard (sic)."  Mr. Hiller testified that "mod" referred to a modification to his Jeep, which was an addition or change to the Jeep, rather than a replacement of equipment.  TT 284:2-14.  He testified that "front diff" referred to the centerpiece of the front axle and the "front diff guard" was a piece of steel.  TT 283:14-23.  The photograph at VV-206 accurately depicted the front diff guard added to Mr. Hiller's Jeep in December 2004.  TT285:19-25.  The front diff guard provided additional protection to the bottom of Mr. Hiller's Jeep's front axle.

        This web posting confirms that Mr. Hiller modified his Jeep Rubicon after the accident, solely in order to gain protection from obstacles encountered during off-roading, and contradicts his claim that he only engaged in low speed, low intensity off-roading that was not jarring to his body.

48.     Mr. Hiller was the author of the web posting at Exhibit VV-388, which was admitted into evidence.  TT 293:15-22.  In that web posting on February 10, 2005,  Mr. Hiller, referring to a roll cage he purchased, stated in part: "Have my cage now sitting in my living room (wife's real happy about that)...I feel like a kid at Christmas that can't go outside and play with his new toy (emoticon omitted)."  The roll cage was sitting in the living room in pieces. TT 293:5-7.  This web posting is probative of Mr. Hiller's state of mind at the time and contradicts his claims that he was in constant, disabling and incapacitating pain at that time.

49.     Writing as "one jeepbro,"  Mr. Hiller was the author of the web postings contained in Exhibit VV-251-261, which were admitted into evidence.  TT

296:15-16, 298:1-2, 299:11-12, 300:8-9.  Mr. Hiller wrote these web postings on March 16, 2005 and described the installation of the Poison Spyder roll cage on his Jeep.  He stated, in part: "I first started out with a screw driver and small hammer to remove a lot of this stuff (under carpeting inside his Jeep).  What a PAIN in the butt this stuff was to remove.  I ended up using a power drill with a wire brush attachment to remove the 'Stuff.'" Exhibit VV-252.  In the next message, Mr. Hiller wrote: "this is what my tub looked like when I finally broke the bolts free and removed the 'Stuff.'  It took me FOREVER to break both the passenger and drivers (sic) side free.  If this pic looks a bit burnt, well, it is.  I had to break out the ol torch to help break free the bolts."  Exhibit VV-252.  Later that same day, Mr. Hiller wrote: "Now for the fun part...The welding.  This took A LONG TIME!  Expect about 6+ hours of measuring, taking and welding to get it all together.  Again, call up that welding buddy!....Durring (sic) my welding experience, I smelt something burning, and noticed a flame shooting up about 6 inches near my windshield..." Exhibit VV-257-258.  In this writing, Mr. Hiller described his active participation in the roll cage installation.

50.    Mr. Hiller was the author of the web posting at Exhibit VV-266, which was admitted into evidence.  TT 288:3-4.  In that web posting on March 17, 2005,  Mr. Hiller stated, in response to a web posting by "1BLKJP" about the posts on the new roll cage Mr. Hiller installed on his Jeep: "Just found that part out...Man my shins hurt (emoticon omitted)."  This web posting is probative of Mr. Hiller's range of motion getting in and out of his lifted Jeep Rubicon and it contradicts his claim that he was in unrelenting disabling pain at that time.

51.    In a subsequent web posting dated July 7, 2005, Mr. Hiller indicated his roll cage project was completed.  TT 327:1328:9; Exhibits VV-275 and VV-276.

14

52.    Mr. Hiller was the author of the web posting at Exhibit VV-282 which was admitted into evidence.  TT 289:2-9.  In that web posting on July 8, 2005, Mr. Hiller wrote, referring to seat covers his wife bought for him for Christmas: "I can't even count all of the compliments I have received just running down the road and trails the last week."  Exhibit VV-282.  This web posting is further evidence Mr. Hiller was driving his Jeep Rubicon off-road during a time when his treating physician, who did not know of the activity, was completing paperwork to secure Mr. Hiller's request for disability retirement.

53.    Mr. Hiller wrote the web posting at Exhibit VV-382 shortly after his appointment with Dr. Stark on June 29, 2005, after which Dr. Stark submitted documents to CalPERS confirming his view that Mr. Hiller was disabled from his job as a CHP patrolman.  Mr. Hiller did not tell Dr. Stark about his off-road driving activity.  TT 360:11-17; 680:16-18.

54.    Mr. Hiller was the author of the web posting at Exhibit WW-611, dated July 9, 2005, which was admitted into evidence.  TT 482:24-483:11.  In that web posting, Mr. Hiller explained that the welding on his new roll cage "will work just fine on any trail" and that he appreciated the comments he received but "by no means am I a professional welder." This web posting confirms Mr. Hiller drove his Jeep on a variety of trails, including difficult ones, and contradicts his claim that he only engaged in low intensity off roading after the accident.  It also undermines his claim that he did not do any welding on his roll cage project.

55.    Mr. Hiller was the author of the web posting at Exhibit VV-366, which was admitted into evidence.  TT 291:7-13.  In that web posting on September 19, 2005, Mr. Hiller stated in part: "I'm taking a welding and metal fab. class for fun and also to polish up my skills through the local college.  We have to make a final project and have about 3 months to

complete the whole thing.  I REALLY want to buid up my own rock sliders for my TJ."  Mr. Hiller testified that a "rock slider" was a reference to a piece of steel protecting the body of his Jeep below the door.  TT 290:4-25.  This web posting confirms Mr. Hiller sought to protect the undercarriage of his Jeep from damage caused by striking rocks while off roading, which contradicts his trial testimony about off roading.

56.     Mr. Hiller was the author of the web posting at Exhibit WW-1083, which was admitted into evidence.  TT 308:7-8.  In that web posting on October 28, 2005,  Mr. Hiller stated in part: "Just hook up some AMR 15x8's.  I've been riding mine for a year or so and like them as a cheap(er) good looking wheel.  I'll sell you mine after my beadlocks come in the mail...That is if you don't mine (sic) rock rash (emoticon omitted)."  Exhibit WW-1083.  Mr. Hiller testified that "AMR 15x8's" were wheels and "rock rash" was damage to wheels, such as from hitting rocks.  TT 307:12-25.  This web posting confirms Mr. Hiller sought to protect the undercarriage of his Jeep from damage caused by striking rocks while off roading, which contradicts his trial testimony about off roading.

57.     Mr. Hiller was the author of the web posting at Exhibit WW-753-WW-754, which was admitted into evidence.  TT 489:3-4.  In that web posting on November 2, 2005,  Mr. Hiller stated: "How can it be cheaper to upgrade your TJ (something you own I assume or close to it) compared to buying a Rubicon and then adding mods to it?  Again, if it's going to be mostly a street vehicle, why waste the money?"  Exhibit WW-754.  This web posting contradicts Mr. Hiller's claim at trial that the Jeep modifications he made after the accident were only "for looks" because Mr. Hiller said modifications were a "waste" of money for a street vehicle.  TT 555:11-21.

58.     Mr. Hiller was the author of the web posting at Exhibit WW-51, which

16

was admitted into evidence.  TT 302:3-4.  In that web posting on November 28, 2005,  Mr. Hiller stated in part: "I have really enjoyed running the Super Swamper SSR's that I am currently running.  They are great off road tires (with the expception (sic) of mud) and really nice on the highway and wet weather." Exhibit WW-51.  "Super Swamper SSR's" were Mr. Hiller's tires at the time of the web posting.  TT 301:13-17.  Mr. Hiller's deposition started two days later on November 30, 2005.  This is more evidence of off roading activity more extensive than admitted to by Mr. Hiller at trial.

59.   Mr. Hiller was the author of the web posting at Exhibit WW-802, another message about his tires, which was admitted into evidence.  TT 306:12-13. In that web posting on October 31, 2005,  Mr. Hiller stated in part, again referring to his Jeep's tires: "I personally run Swamper SSR's, and have really enjoyed them.  My Jeep is a "Weekend Warrior," and these have worked out well both on and off road."  This is more evidence of off roading activity more extensive than conceded by plaintiffs at trial.

60.   Mr. Hiller was the author of the web posting at Exhibit WW-89, which was admitted into evidence.  TT 302:25-303:4.  In that web posting on November 28, 2005, Mr. Hiller wrote: "You learn to appreciate power door locks, especially when it's pouring rain outside and you have to help your 7 month pregnant wife into your lifted TJ (emoticon omitted)."  Mr. Hiller's deposition started two days later on November 30, 2005.  This web posting contradicts plaintiffs' claim at trial that Mr. Hiller was restricted in his ability to move or help his wife, and the claim that he was in disabling and incapacitating pain.

61.   Mr. Hiller learned in 2006 that the United States Attorney's Office found the jeepforum.com web postings.  TT 523:5-9.

62.   Mr. Hiller put his Jeep up for sale in late August or early September 2006.

TT 523:17-20.

**B.      Mr. Hiller did not produce photographs of his Jeep on unpaved trails, despite a Court order requiring him to do so.**

63.      In June 2006, the Court ordered Shawn Hiller to produce all relevant electronic documents, which included photographs of his Jeep, e-mails and the like.  TT 502:7-11; Exhibit JJJ.

64.      Although the Court's order was not limited to e-mails, the computer expert appointed by the Court to review Mr. Hiller's computer hard drive was not permitted by plaintiffs' attorneys to search for photographs, web postings, or other electronic documents.  TT 994:14-995:21.  All of the computer expert's instructions in performing this work under the Court's appointment in the June 2006 order came from plaintiffs' attorneys, and plaintiffs' attorneys alone determined what would and would not be printed and saved.  TT 1001:22-1002:2.

65.      In December 2006, the Court ordered Mr. Hiller to produce all relevant documents including photographs of his Jeep.  Docket #85.  Exhibit YY was Mr. Hiller's response to that order.  TT 492:3-7.  In fact, plaintiffs' attorney responded by letter dated December 21, 2006 stating, in part, "All photos of his Jeep are enclosed as well."  Exhibit YY, page 1.

66.      But not all photos of the Jeep were included.  At trial, Mr. Hiller reviewed Exhibit YY, under cross examination, and confirmed that all photographs of his Jeep that he produced in discovery were contained in YY at pages numbered 781-811 and 924-929.  TT 493:24-494:10, 494:14-495:7.

67.      Mr. Hiller reviewed the entire remainder of Exhibit YY and confirmed that there were no other photographs of his Jeep contained in the exhibit.  TT 495:9-500:3.

68.      Specifically, there were no photographs of Mr. Hiller's Jeep at Hollister

Hills, in the hills above Montara, or in the muddy location in Half Moon Bay produced in Exhibit YY, despite the representation by Mr. Hiller that "all photos of his Jeep" were included.

69.     At his deposition in January 2007, ordered by the Court in the Order Reopening Discovery (Docket #85), Mr. Hiller testified under oath he went off-roading at Hollister Hills three times and that the three times he went to Hollister Hills Park were the only times he used his Jeep off-roading after the February 2004 accident.  TT 529:3-7.

70.     Then, defense counsel showed Mr. Hiller the photographs of his Jeep in the muddy location in Half Moon Bay and in the hills above Montara, which are from Mr. Hiller's on-line album at a website called Image Station.  TT 529:8-13.

71.     Nevertheless, Mr. Hiller testified at trial that he produced some of the photographs in discovery.  TT 338:19-25.  He then testified that he did not provide the photographs of his Jeep at Hollister Hills, because he "didn't know where they were at..."  TT 339:1-6.

72.     After the accident, Mr. Hiller's longtime friend Eric Gatty saw a dozen or so photographs of Mr. Hiller's Jeep off-road with mud on it.  TT 68:6-7, 15-22.  At trial, however, only three photos of the Jeep off-road with mud on it came into evidence.

**C.     Shawn Hiller did not disclose his off-road driving activities.**

73.     At the time of the accident, Shawn Hiller had owned his Jeep for six months after purchasing it brand new and with low miles.  TT 339:9-340:1.  Mr. Hiller did not drive his Jeep off road during the six months leading up to the accident, other than pulling off the side of the highway to view the ocean.  TT 341:2-21 [reading Mr. Hiller's sworn deposition testimony].  Mr. Hiller did not drive any other vehicle other than his Jeep Rubicon off-road during that six month period.  TT 342:2-5.  Thus, all off-

roading done by Mr. Hiller in his 2004 Jeep Rubicon occurred after the accident.

74.    But after the accident, Mr. Hiller told his doctors he was unable to participate in off-roading.  TT 357:2-9 [Dr. Barber – January 2005], 368:13-17 [Jones], 611:25-612:4 [Sutro].

75.    After repairs by Superior Body Shop, Mr. Hiller took possession of the repaired Jeep on April 12, 2004.[2]  TT 352:23.

76.    When asked on cross examination if he was the primary driver of the Jeep after the accident, Mr. Hiller confirmed that he was, stating the "Jeep was all mine."  TT 352:24-353:14.

77.    According to Plaintiff's Exhibit 10, the Jeep odometer reading on April 12, 2004 was 9,884, but on April 25, 2004, the odometer reading was 10,575.  During that 13 day period, when he contends he was in unrelenting pain, Mr. Hiller drove the Jeep 681 miles, an average of more than 53 miles per day.

78.    During the four months from April to August 2004, Mr. Hiller admitted on cross-examination, he was driving the Jeep on off-road trails.  TT 544:13-19.

79.    The MRI of Mr. Hiller's spine displayed at trial occurred on April 28, 2004, three days after the Costco receipt that confirmed Mr. Hiller's driving activity during April 2004, a time when he admitted he drove the Jeep off road.  TT 380:5.

80.    On August 23, 2004, the Jeep's odometer reading was 13,213.  TT 545:10-17; Exhibit III-14 (admitted at 546:20-21).  During the period of April 12th to August 23, 2004, when Mr. Hiller contends he was still in unrelenting pain, Mr. Hiller drove his Jeep 3,329 miles or an average of 25

---

[2]Plaintiffs make no claim for property damages in this case.  TT 1103:11-17.

miles every day.

81. As noted, during this period, Mr. Hiller admitted on cross-examination, he was driving the Jeep on off-road trails.  TT 544:13-19.  During this same period, and for nine months after the accident, Mr. Hiller told Dr. Saal his treating physician that he was in constant pain.  TT 353:17-22.  During this same period, Mr. Hiller told the CHP, through Dr. Saal's reports, that he was in constant pain and unable to work.  TT 353:23-354:4.

82. According to an e-mail message written by Mr. Hiller on October 29, 2004, he was running a 3.5" lift on his Jeep that "works well as a DD (daily driver) and well off road."  Exhibit YY-921; TT 354:23-356:10.

83. Mr. Hiller drove his Jeep to a muddy location in Half Moon Bay in late December 2004 or early January 2005 and took photographs of his Jeep that he shared with friends by e-mail.  Exhibit ZZ-3; TT 315:14-317:15; Exhibit ZZ-4; TT 317:17-318:19.  He did not produce these photographs in discovery, despite two court orders requiring him to do so.  Exhibit JJJ & Docket #85.  Just a few days later, Mr. Hiller told Dr. Barber he was "unable" to drive a Jeep off road.

84. Mr. Hiller drove his Jeep on unpaved trails in the hills above Montara, California on February 10, 2005.  TT 312:4-20, 314:21-315:5; Exhibit ZZ-2; TT 319:14-323:16; Exhibits ZZ-5, ZZ-6, ZZ-7, and ZZ-9.  He did not produce these photographs in discovery, despite two court orders requiring him to do so.  Exhibit JJJ & Docket #85.

85. Mr. Hiller testified he drove his Jeep on unpaved trails in the hills above Montara on one or two occasions altogether, after the accident.  TT 322:25-323:9.  But he explained that the photographs at Exhibit ZZ-2, ZZ-5, ZZ-6, ZZ-7, and ZZ-9, stamped February 10, 2005, were from a single visit to that area.  TT 324:22-325:6.

86. On this same date, February 10, 2005, Mr. Hiller had a meeting in San

21

Mateo with his Captain and the State Compensation Insurance Fund about his "future employment with the CHP." TT 365:1-18; Exhibit AAA-15.

87.     On June 14, 2005, Mr. Hiller wrote an e-mail stating that the week before he was "out of town" on a "Jeep Trip." TT 511:10-512:3 & Exhibit AAA-134.

88.     Mr. Hiller admitted he testified at deposition in January 2007 that he went off roading at Hollister Hills on three occasions. TT 528:6-8. He drove his Jeep on the majority of the roads in that park, including "hilly" and "bumpy" roads. TT 528:9-17.

89.     Mr. Hiller took photographs of his Jeep at Hollister Hills Off-Highway Vehicle Park on or about the dates in July 2005 shown on the photographs. TT 329:2-333:15; Exhibits ZZ-14, ZZ-15, ZZ-17, ZZ-18, ZZ-19, ZZ-20, ZZ-21, ZZ-22, ZZ-23, ZZ-24, ZZ-25, ZZ-26, ZZ-27, ZZ-28, and ZZ-29. Mr. Hiller posted these photographs on-line. TT 336:12-13. He did not produce these photographs in discovery, despite two court orders requiring him to do so. Exhibit JJJ & Docket #85.

90.     On July 14, 2005, Mr. Hiller wrote an e-mail stating that the day before, July 13th, he was at Holister (sic) "playing hooky." TT 514:22-515:22 & Exhibit AAA 316.

91.     In a web posting dated October 21, 2005 Mr. Hiller produced in response to the Court's December 8, 2006 order reopening discovery, received into evidence as Exhibit YY-822, Mr. Hiller stated about four-wheel driving: "It can get a little challenging if you go through some of the dried up creek beds (washes). They are not marked on the map, but after you find them, you'll be glad you did. That and White Rock can be fun." TT 496:15-497:17. Mr. Hiller testified that "White Rock" is a reference to a mountain. TT 498:15-16. Mr. Hiller admitted he drove his Jeep to White Rock after the accident. TT 341:2-21, 342:2-5, 528:18-20. At trial,

however, Mr. Hiller testified that he did not participate in any "challenging" off-roading activity after the accident, contradicting his web posting.

92. In a web posting dated October 21, 2005 Mr. Hiller produced in response to the Court's December 8, 2006 order reopening discovery, received into evidence as Exhibit YY-823, Mr. Hiller stated as part of the same thread discussion involving YY-822, "Yeah, as you drive around on the main roads, you can see the washes below. There is plenty of vehicle traffic in and out of the washes. If it was forbidden, I imagine they would have blocked them off a long time ago." TT 498:12-13. This web posting is probative of, and contradicts, Mr. Hiller's claim that he only engaged in low intensity off roading after the accident, because here he discusses driving off the regular trails onto other areas other Jeep enthusiasts thought may be forbidden.

93. Childhood friend Eric Gatty testified he went off-roading with Mr. Hiller on one occasion after the accident. Mr. Hiller invited Mr. Gatty to go off roading at Hollister. Mr. Gatty described this activity on direct examination as low speed compared to what he and Mr. Hiller did when they were youngsters. Mr. Gatty testified this occasion was after he graduated from the CHP Academy in August 2005. TT 53-56. He believed it took place in the latter part of 2005, but could not be sure. TT 55:9-20. Mr. Gatty estimated he and Mr. Hiller spent 5-6 hours at Hollister, after driving to Hollister from Half Moon Bay. TT 58:21-23, 59:16 62:25-63:4. They drove around Hollister Hills park, over bumpy trails and bumpy dry creek washes, for 5-6 hours. TT 63:5-15. According to Mr. Gatty, on this occasion, he and Mr. Hiller drove at estimated speeds of 25 miles per hour to drive up to the piles of rocks at Hollister and then 2-3 miles per hour over the rocks. TT 79:1-20. In response to the Court, Mr. Gatty later clarified that the driving time around Hollister on this

occasion was "probably three hours" out of the total of 5-6 hours.  TT 80:1-2.

94.  Mr. Hiller disagreed with his longtime friend's speed estimates, stating Mr. Gatty was "plain wrong" when he gave his speed estimates.  TT 335:14-336:1.

95.  Mr. Gatty testified he was aware of one other occasion on which Mr. Hiller drove his Jeep off-road after the accident.  About that occasion, Mr. Hiller told him he went to Hollister, after the accident, and said "It's a good time down there."  TT 69:3-21.

96.  Of all the expert medical witnesses to testify at trial, only Dr. Harrington considered the evidence of Mr. Hiller's off-roading activities in reaching his opinions.  TT 452:16-20.  He testified that the off-roading activity after the accident put a "great deal" of stress on Mr. Hiller's back and that it appeared Mr. Hiller was engaged in activities far in excess of what he claimed he could not do as a result of the accident.  TT 452:21-453:10, 462:1-25.

97.  None of the doctors called to testify by Shawn Hiller was aware of Mr. Hiller's off-roading activity at the time they expressed their opinions during discovery.  He told Dr. Barber in January 2005 he was unable to participate in off-roading.  TT 357:6-9.  He did not tell Dr. Stark about his off-road driving.  TT 360:11-17; 680:16-18.  He told Dr. Jones on the single occasion they met in March 2005 that he could no longer off-road due to the accident.  TT 368:13-17, 398:18-23.  He told Dr. Sutro when they met in April 2005 that he could not drive a Jeep off road.  TT 612:3-4, 630:24-631:1.  At their single meeting in March 2006 for the purpose of assessing whether Mr. Hiller should return to the CHP, Mr. Hiller did not tell Dr. Lang about his off-road driving.  TT 745:12-15.

98.  Mr. Hiller's other retained experts did not know about his off-road

driving.  Engineering expert Dr. Tuft was not aware of Mr. Hiller's off-roading activity at the time he wrote his expert report in this case.  TT 859:17-20.  Mr. Hiller's vocational rehabilitation expert Carol Hyland was not aware of his off-roading activity when she wrote her Rule 26 report. TT 133:20-24.

**D.**     **Shawn Hiller exaggerated his injury, his condition and his pertinent medical history to the doctors he saw after the accident.**

**1.**     **Statements to doctors about the accident and the Jeep**

99.     Shawn Hiller told Drs. Saal, Barber, Stark, Jones and Sutro that the Postal Service truck rear-ended his Jeep at 35-40 miles per hour.  He made these statements starting in March 2004 (to Dr. Saal) and continuing to May 2006 (Sutro).  When he examined Mr. Hiller in March 2006, Dr. Lang received the records of Drs. Saal, Barber, Stark, Jones, and Sutro, containing the references to Mr. Hiller's estimate of the Postal Service vehicle's impact speed.  TT 725:21-726:9, 738:5-24.

100.    Mr. Hiller told Drs. Saal, Barber and Lang that as a result of the accident, his Jeep was totaled.   He made these statements from March 2004 (to Saal) to January 2005 (to Barber) to March 2006 (to Lang).  From April 2004, Mr. Hiller retained possession of his Jeep, made numerous modifications to the Jeep, and drove it regularly, including driving on unpaved, off-road trails.

101.    The Court finds that Mr. Hiller's statements to the doctors created an inaccurate record about the severity of the accident.  In fact, the parties' experts estimated the impact speeds were between 4 and 17 miles per hour.  Furthermore, the forces acting on Mr. Hiller's spine in the accident were lower than everyday activities such as carrying a 20 pound object. TT 1016:23-1021:11, 1023:7-1025:19.  Mr. Hiller's testimony confirmed that his lower back was well-supported by the Jeep's driver seat in the

accident and his back did not exceed its physiologic range of motion.  TT 1015:23-1016:20, 1021:17-1022:10.

**2.      Statements to the doctors about his condition**

102.   Shawn Hiller told Drs. Saal, Barber, Jones, Sutro and Lang that as a result of the accident, he was in constant pain that prevented him from working at the CHP.

103.   He made these statements starting in March 2004 (to Saal) and continuing to March 2006 (to Dr. Lang).

104.   When he made these statements, according to his writings on-line, Mr. Hiller was equipping his Jeep with modifications designed to protect it during off-roading activity, such as a steel plated cover to protect the underside of the front axle called a "diff guard," driving his Jeep on a daily basis, driving his Jeep on off-road trails he described as "challenging" and working for his friend's business as a customer service representative, none of which he disclosed to these same doctors.

**3.      Undisclosed previous low back symptoms and unreliable medical history**

105.   Shawn Hiller had at least one previous instance of low back pain before the accident.  When he described his relevant previous medical history to the doctors he saw after the accident, he either omitted mention of the previous incident or gave a history contradicted by the medical records that came into evidence.

106.   At trial, on direct, Mr. Hiller testified he pulled a muscle in his "mid-back" in 2002.  TT 174:1-9; 529:18-20.

107.   Before trial, however, whenever he told the doctors about the pulled muscle in 2002, Mr. Hiller described it as a lumbar strain.  For example, according to his retained medical expert Dr. Sutro, Mr. Hiller reported a

26

lumbar strain in 2002, not a mid-back strain.  TT 612:11.

108.  Others, such as Dr. Clement Jones, were not even aware of Mr. Hiller's previous lumbar strain.  TT 408:4-5.

109.  Dr. James Stark did not have any medical records from before the February 2004 accident.  TT 408:14-24.

110.  Dr. Stark did not see any kind of diagnostic study from before the February 2004 accident.  TT 699:2-4.

111.  Dr. Stark knew that Mr. Hiller had had x-rays in connection with the 2002 lumbar strain, because of Mr. Hiller's statements, but Dr. Stark did not know how long Mr. Hiller had experienced symptoms in 2002.  TT 705:14-22.

112.  Dr. Lang testified Mr. Hiller had "not had any previous trouble with his back, except some minor thing in 2001."  TT 736:11-15.

113.  Dr. Lang did not see any diagnostic studies of Mr. Hiller's lumbar spine from before the February 2004 accident.  TT 744:24-745:1.

114.  When he met with vocational rehabilitation expert Andrew M. O'Brien, Mr. Hiller stated he had no pre-existing injuries.  TT 927:2-4.

115.  According to the evidence at trial, however, Mr. Hiller sought medical care from EPT Physical Therapy in October 2002 for a muscle pull in his lower back.  TT 540:22-541:2.

116.  When he sought care from EPT, Mr. Hiller had been experiencing symptoms in his low back for approximately five months.  TT 437:10-18; Exhibit HHH-9, 10.

117.  According to Mr. Hiller's retained orthopedic expert, Dr. Sutro, the date of onset of the symptoms documented in the EPT records was May 11, 2002.  TT 632:15-634:16.

118.  When he sought care from EPT, Mr. Hiller completed a two page

27

questionnaire, admitted into evidence as Exhibit HHH-9 and HHH-10.  TT 536:14-15.

119.   On HHH-9, Mr. Hiller wrote under "Additional Comments" that he "have not done since injury" in reference to sports or recreation.

120.   He noted on HHH-10 that was not exercising at home "since injury" and described his pain as "100%" due to low back pain.

121.   Plaintiffs gave a differing account at trial.  Mr. Hiller testified he missed three weeks from work but otherwise had no recollection of any difficulty from the "mid-back" muscle strain.  Stacey Hiller claimed she and Mr. Hiller took a vacation to Bali during which they went hiking, snorkeling, and swimming, without difficulty, during the brief period after the four visits to EPT Physical Therapy in October 2002, but before Mr. Hiller entered the CHP academy in December 2002.  TT 869:1-15.

122.   When he did report the previous low back symptoms, Mr. Hiller gave inconsistent accounts of it to his doctors.  For example, he told Dr. Saal he had treatment for his low back **before** the physical therapy recorded in the EPT records from October 2002.  TT 454:12-15.

123.   Mr. Hiller told Dr. Lang he strained a muscle in his lower back in 2001.  TT 742:13-18.

124.   On cross-examination, Mr. Hiller stated he did not recall that the date of onset of his complaints in 2002 was five months before he sought treatment, despite being shown several references to the date of injury contained in the EPT records.  TT 537:2-541:14.  Mrs. Hiller also could not remember how long her husband experienced back pain in 2002.  TT 868:1-5.

E.   **Mr. Hiller's testimony regarding his ability to work was not credible**

   1.   **Light Duty at CHP**

28

125.   The Court finds that Shawn Hiller's testimony at trial on the subject of whether he knew he could return to the CHP for light duty as of October 2004 is not credible.

126.   The Court heard testimony from Mr. Hiller and his commander, Captain Bridget Lott, and the Court finds Captain Lott was a credible witness, as explained below.

127.   Mr. Hiller's testimony regarding light duty evolved during the trial.  On direct examination, Mr. Hiller testified that Captain Lott first contacted him regarding light duty "approximately a year after my collision."  TT 214:3-6.  He testified Captain Lott called him because his 4800 time was about to expire.  TT 214:9-12.  Mr. Hiller testified he told Captain Lott in this conversation that he was not medically cleared to go back to work, was represented by an attorney and was advised by his area representative that he should not be talking to Captain Lott.  TT 215:11-18.

128.   On cross-examination, Mr. Hiller claimed that he told Captain Lott, per the "advice" of his doctor, that he could not return to light duty when she called him in February 2005.  TT 360:19-25.  He denied that he told Captain Lott he could not return to light duty because his doctor and his attorney would not authorize it.  TT 361:1-4.

129.   The medical evidence at trial established that Mr. Hiller's condition was stable as of September 2004, approximately when Captain Lott began asking for him to work light duty, even if from home.  Dr. Jones testified that from September 2004 to March 2, 2005, when Dr. Jones saw Mr. Hiller, Mr. Hiller's pain had plateaued.  TT 414:4-17.  Dr. Stark testified that Mr. Hiller told him in January 2005 at their first meeting that his condition was unchanged over the previous four months, or since September 2004.  TT 699:5-8.

130.   Dr. Stark testified that Mr. Hiller could have returned to light duty at the

CHP when he first examined him in January 2005, explaining that CHP is "very flexible" with regard to light duty. TT 704:18-22. But the first time Mr. Hiller requested a release to light duty work was in October 2005. TT 526:3-5.

131. After speaking to Captain Lott about one year after the accident, Mr. Hiller testified that he did not attempt to return to light-duty. TT 215:21.

132. Mr. Hiller testified on re-direct that if CHP had offered him a light duty position before October 2005, he would have taken it because he was "hurting for money." TT 572:21-573:7.

133. Then on re-cross, Mr. Hiller denied that when he was answering phones for Jeepers and Creepers, during the summer months of 2005, he was aware he could have been working light duty for the CHP. TT 579:18-21. He also denied on re-cross that he had been told he could work light duty from home at that time. TT 579:22-580:5.

134. Mr. Hiller explained that he was "hurting for money" when he learned that his accrued compensated time off was running out, which was after he received one year's full pay and benefits, tax free (so-called "4800 pay") and then used up his accrued vacation and other comp time. TT 582:18-589:16 & Exhibit BB-349 [e-mail dated 8/11/05].

135. In contrast to Mr. Hiller's testimony, Captain Bridget Lott, Redwood City CHP commander, testified that she first offered to assign light-duty work to Mr. Hiller in October 2004, when she told Mr. Hiller he could perform light-duty work from his home, even if only part time. TT 894:1-25. Light duty work from home would have involved basic filing and paperwork review, and Captain Lott was willing to have the work brought to Mr. Hiller. TT 894:20-895:4.

136. Mr. Hiller's response to Captain Lott's offer was that he had to check with his attorney and his doctor. TT 894:13-14. During this same month,

October 2004, Mr. Hiller, through his attorney, made a multimillion dollar damages claim against the United States.  TT 1089:12-1091:15.  At that time, no doctor had informed Mr. Hiller he would have to retire from the CHP.  TT 1091:16-1092:8.

137.   Captain Lott observed Mr. Hiller for the first time when he visiting the CHP office in late 2004, carrying his baby, and she was surprised that he appeared healthy.  TT 908:22-909:11.

138.   Captain Lott had a conversation with Mr. Hiller on February 9, 2005 about working light duty from his home.  TT 898:22-24.  Mr. Hiller specifically told Captain Lott that he needed to speak to his doctor and his attorney and that they would not authorize limited duty for him.  TT 899:9-13; Exhibit E-433.

139.   During the period of October 2004 to October 2005, when Captain Lott contacted Mr. Hiller on at least a monthly basis to get him back to light duty, his response was always the same, namely that he "needed to speak with his attorney and his doctor."  TT 895:23-896:3.

140.   Captain Lott told Mr. Hiller he "should be talking to his doctor.  The doctor's the one that makes the decision on his medical return to work, not the attorney."  TT 921:14-21.

141.   Then, in October 2005, when all of Mr. Hiller's accrued compensated vacation time and other time on the books and benefits expired, he finally requested his doctor to release him to limited duty so that he could come back to work at CHP.  TT 896:4-11.

142.   Captain Lott credibly testified that the first step in getting an injured CHP patrolman to work on light duty is for the employee to be "willing" and to get a release from his doctor.  TT 896:12-15.  Further it is CHP's policy for an employee to return to work in either full or limited duty as soon as it is medically appropriate.  TT 896:16-19; Exhibit E-389 through E-394.

Mr. Hiller had an obligation under CHP policy to seek to return to work as soon as it was medically appropriate. TT 898:17-20.

143. Witness Matt Hiatt was the Area Representative at Redwood City CHP after January 2005, called to testify at trial by plaintiffs. He testified that he first started talking to Mr. Hiller about returning to light-duty when, as Mr. Hiatt related under oath, Captain Lott told him Mr. Hiller was about to run out of "4800 time" and vacation time. TT 109:5-17. He estimated the date of the conversation with Captain Lott as 1-2 months before Mr. Hiller actually returned to light-duty work. TT 115:11-19. His testimony was not credible, in light of Captain Lott's testimony.

144. "4800 time" is full pay and full benefits, tax free, for up to one year after an on-the-job injury. TT 109-110. The injury has to be significant enough for a doctor to say the injured person cannot return to work before the injured officer will receive the full extent of one year's 4800 pay. TT 585:17-586:13.

145. Mr. Hiller received 4800 pay for one year after the accident and after that point, CHP paid Mr. Hiller payments for all of his leave balances. TT 904:15-905:3. In fact, Mr. Hiller requested payment for all of his compensation and leave balances in an e-mail dated April 29, 2005. TT 905:8-907:25; Exhibit RR-11. Mr. Hiller's compensation and leave balances ran out in October 2005, and at that point he requested a light duty release. TT 908:2-21.

146. However, from April to September 2005, Mr. Hiller worked as a customer sales representative for Jeepers & Creepers. Exhibits AAA-27 [e-mail dated 4/26/05] & AAA-358 [e-mail dated 9/8/05]. He answered the phone for Jeepers & Creepers, made phone calls, and communicated with customers and vendors by e-mail. Exhibits AAA-27, AAA-52, AAA-69, AAA-70, AAA-134, AAA-140, AAA-141, AAA-316.

147.   He performed these services for Jeepers and Creepers for six months, five days a week, sometimes working ten hours a day.  TT 590:20-591:24; Exhibit AAA-70.  At his deposition in November 2005, however, Mr. Hiller testified that he only helped Jeepers and Creepers for a couple of weeks.  TT 520:7-10.

148.   When Mr. Hiller returned to work light duty in December 2005, he performed a variety of tasks including filing, review of reports, inventory work.  TT 909:13-17.  Captain Lott testified she found his work during the six months of light duty to be exemplary.  TT 910:19-914:10.

149.   Captain Lott could not recall seeing any signs in Mr. Hiller of physical discomfort during the six months he worked light duty from December 2005 to May 2006.  TT 914:11-13.

150.   If Mr. Hiller had accepted light duty work when offered by Captain Lott, starting in October 2004, he would have retained the same pay and benefits as a CHP patrolman.  TT 900:13-901:1.  He could have returned to light duty and still applied for disability retirement.  TT 901:14-18.

### 2.     Undisclosed work for Jeepers and Creepers

151.   Shawn Hiller testified on direct that he helped his friend James Wong by answering the phone if customers of Mr. Wong's business, Jeepers and Creepers, called in to ask a question or make an order.  TT 221-222.

152.   Exhibit AAA-27 was an e-mail written by Mr. Hiller dated April 26, 2005 that was received into evidence.  TT 508:23-24.  In the e-mail, titled "First Day," Mr. Hiller recounted information about the day's transactions for Mr. Wong, including two orders, six "call backs," and three "pending deals."  Mr. Hiller wrote this e-mail on the day following his first appointment with his hired expert orthopedic surgeon Dr. Sutro according to Dr. Sutro's testimony at TT 609:25-610:3.

153. Exhibit AAA-52 was an e-mail written by Mr. Hiller dated May 19, 2005 that was received into evidence. TT 510:3-4. In the e-mail, Mr. Hiller described transaction information for Mr. Wong, and reminded Mr. Wong that "I will be gone ALL DAY tomorrow for re-volcational (sic) testing and interview in Oakland CA. I leave at 7 am and get home after 6 pm."

154. Mr. Hiller did not tell his vocational rehabilitation expert Carol Hyland when they met in May 2005 about his work for Jeepers & Creepers. TT 134:5-9.

155. Exhibit AAA-69 and AAA-70 was an e-mail written by Mr. Hiller dated May 31, 2005 that was received into evidence. TT 511:7-8. In the e-mail, Mr. Hiller described five "orders placed" to Mr. Wong and then stated "JAMES: Let me know what my cut is for the above items (besides the air intake, I know you aren't making any money on it)." By contrast, on direct, Mr. Hiller testified he worked as a volunteer only for Jeepers and Creepers. TT 221:8.

156. At the end of Exhibit AAA-70, Mr. Hiller wrote "I have been on the phone from 9 am to 7 pm, so I am burnt."

157. On June 17, 2005, Mr. Hiller wrote an e-mail with his thoughts about the Jeepers and Creepers website, as well as those of his wife Stacey, including ideas about web site set up, function, content organization, content, and grammatical errors in the content. TT 512:5-513:3 & Exhibit AAA-140 to AAA 141.

158. On June 28, 2005, Mr. Hiller sent an e-mail to Mr. Wong letting him know of his whereabouts the following day: "FYI, Forgot, I have a Doc. Appointment (again) in SF Doctor Stark for my CHP crap at 1300 tomorrow. Just FYI!" AAA-210 was received into evidence. TT 514:19-20.

159. At the time he drove his Jeep off road at Hollister in July 2005, Mr. Hiller

34

was taking Vicodin or Norco as prescribed by his treating doctor Dr. Stark. TT 580:9-23. He also received Vicodin pain medication from his grandfather during a visit to Humboldt County. TT 580:24-581:5. Mr. Hiller could not remember how many Vicodin he received from his grandfather or when he received the Vicodin from his grandfather, and he could not recall whether he had additional sources of prescription pain medication in addition to his grandfather and Dr. Stark. TT 581:6-582:10. His grandfather was not a medical doctor and Mr. Hiller never informed Dr. Stark that he obtained Vicodin from his grandfather. TT 582:11-15.

160. According to a web posting written by Mr. Hiller on Exhibit YY-899, dated July 12, 2005, Mr. Hiller wrote "I'm just sittin (sic) around waiting to help you all out with your Jeep parts!" Exhibit YY-899 was received into evidence. TT 502:1-2.

161. According to web postings written by Mr. Hiller on Exhibit YY-894, dated July 25, 2005, Mr. Hiller wrote "New from Jeepers and Creepers is our exclusive line of Diff Guards...Our Diff. guards are a full rock ring model, tested on the Rubicon (and mini Rubicon Hollister Hills (emoticon omitted))." The web posting went on to state the special introductory price and asked those interested to "shoot me an email." Exhibit YY-894 was received into evidence. TT 501:6-7.

162. On September 8, 2005, Mr. Hiller sent an e-mail to Mr. Wong explaining that he could no longer work for Jeepers and Creepers. Exhibit AAA-358 & TT 519:6-7. In this e-mail, Mr. Hiller wrote: "So, with school, family, health, construction work and Lawyer stuff, I feel that I am still going to have to remain away from Jeepers and Creepers for some more time...With all that has been going on, something was going to give, and it appears that it was my HEALTH. I don't quite know what went wrong, but according to my doctor, I am stressing myself out which is the root of

my health problems.  I didn't think I was stressing out, but go figure."

163.    Mr. Hiller did not produce any of the e-mails in Exhibit AAA during discovery.  TT 520:11-25.

164.    Mr. Hiller did not tell the defendant's vocational rehabilitation expert Andrew M. O'Brien about his work for Jeepers and Creepers at their interview.  TT 928:20-22.  As noted previously, he did not tell his own vocational rehabilitation expert Carol Hyland about his work for Jeepers and Creepers at his interview with her in May 2005.

165.    The Court granted defendant's motion to reopen discovery and permit the defense experts to supplement their reports.  As a result, defense vocational rehabilitation expert Andrew M. O'Brien testified at trial that Mr. Hiller's off-roading activities and his work for Jeepers and Creepers confirmed concerns about secondary gain and financial incentives, and that Mr. Hiller could have gone back to work earlier than he did if he had pursued light duty or alternate employment with the CHP.  TT 947:2-18.

**VI.    The medical evidence regarding Mr. Hiller's condition after the accident**

166.    After driving his Jeep to the Redwood City CHP office, Shawn Hiller rode as a passenger in a vehicle to the Sequoia Medical Center emergency room about 45-60 minutes after the accident, complaining of pain in his neck and lower back.  TT 195:3-17; 345:15-22.  There were no x-rays taken.  TT 195:21.

167.    The Sequoia emergency room doctor instructed Mr. Hiller to return to full duty in two days and to return to the Sequoia occupational health office in two days, but Mr. Hiller did not follow either of those instructions.  TT 345:24-346:19

168.    Mr. Hiller did not return to the Sequoia emergency room or any other

emergency room as a result of the accident, because he testified there was "no need" for emergent care.  TT 347:1-4, 23-25.

169. Within a day or two after the accident, Mr. Hiller asked his Area Representative to recommend a good doctor and his Area Representative recommended Joel Saal, M.D.  TT 347:8-22.

170. Mr. Hiller testified on direct he first saw Dr. Saal about three weeks after the accident due to a "mix up" in workman's compensation paperwork. TT 196:7-25.

171. On cross-examination, Mr. Hiller could not recall making any statement that he did not want to see a "state doctor" who would return him to work sooner than he wanted to return.  TT 347:5-7.  Then, when shown the appropriate exhibit, he agreed he wrote in an e-mail on June 2, 2005: "Sure I could have just gone to a state doctor, but they were the same folks who told me I would be back to full duty in two days."  TT 349:1-8.  The e-mail was received into evidence as Exhibit BB-354 and BB-355.  TT 349:18-19.

172. Mr. Hiller first saw Dr. Saal on March 15, 2004, 19 days after the accident.  TT 349:21-25.  Mr. Hiller told Dr. Saal his Jeep had been totaled in the accident and he had been struck from behind at 35-40 miles per hour.  TT 350:3-7.  Mr. Hiller treated with Dr. Saal for the next nine months.  TT 198:25.

173. Dr. Saal did not testify at trial.

174. Mr. Hiller saw Dr. Victoria Barber on a single occasion in early January 2005. TT 357:2-5.  Mr. Hiller told Dr. Barber he could not participate in off-roading. TT 357:6-9.  Mr. Hiller told Dr. Barber he was struck from behind by the Postal vehicle traveling 35-40 miles per hour.  TT 357:20-23.  Mr. Hiller told Dr. Barber his Jeep had been totaled after the accident. TT 357:24-358:1.

175.  In early January 2005, Mr. Hiller had his Jeep back after repairs, had had it for over 8 months, had made several modifications to the Jeep including adding a steel protective cover to bottom of the front axle, as documented by his on-line writings at jeepforum.com, and was driving that same Jeep on off-road trails.

176.  Three days before he saw Dr. Barber, Mr. Hiller wrote an e-mail dated January 2, 2005, in which he stated: "Here are some pic's (absolutely does my jeep no justice) of me getting stuck and unstuck after trying to get some local kids out of a jam...They were taken from my Cell Phone..." Exhibit AAA-8, AAA-9, AAA-10, AAA-11; TT 358:9-359:10.

177.  Mr. Hiller did not mention to Dr. Barber that he had been driving his Jeep a few days beforehand and got it stuck in the mud and unstuck.  TT 359:12-15.

178.  Dr. Barber did not testify at trial.

179.  After the single appointment with Dr. Barber, Mr. Hiller went to see Dr. James Stark for the first time in late January 2005, as arranged by plaintiffs' attorney Kevin Morrison.  TT 359:16-360:1.   The date of that first appointment with Dr. Stark was January 25, 2005.  TT 649:10.  Dr. Stark practices physical medicine and rehabilitation.  TT 645:1-5.  He is not an orthopedic surgeon and his practice is non-surgical. TT 699:15-18.

180.  Dr. Stark is Mr. Hiller's treating physician and has been since January 2005.  TT 647:23.  Dr. Stark obtained information from Mr. Hiller on that first visit and relied on Mr. Hiller's statements to form the basis of his treatment.  TT 649:14-650:10.

181.  Mr. Hiller told Dr. Stark the Postal truck struck his vehicle from behind at a speed of 35-40 miles per hour.  TT 360:2-5.  He told Dr. Stark he was in constant pain.  TT 360:9-10, 651:1-4.

182. But Mr. Hiller did not tell Dr. Stark he had been driving his Jeep in the mud in early January as shown in Exhibit AAA-8 to AAA-11.  TT 360:11-17.

183. Dr. Stark found no evidence of neurological deficit or abnormality on examination of Mr. Hiller during the January 2005 examination, but Mr. Hiller told him he had pain in his lumbar spine from flexion or extension.  TT 653:1-7.

184. Mr. Hiller told Dr. Stark during that first visit that he had been feeling the same for the past four months.  TT 699:5-8.

185. Dr. Stark next saw Mr. Hiller on May 17, 2005.  TT 662:2-4.  Mr. Hiller told Dr. Stark that he continued to experience constant lower back pain of variable intensity.  TT 662:10-15.  At that point, Dr. Stark believed Mr. Hiller had "discogenic pain" that was permanent, with little chance of improvement.  TT 663:2-22.

186. Contrary to the opinion testimony given by all of the other doctors called to testify in this case, Dr. Stark concluded that nobody could know if the degenerative changes seen in the April 2004 MRI of Mr. Hiller's lower back pre-existed the February 2004 accident because "there was no prior scan."  TT 663:25-664:4.

187. In May 2005, Dr. Stark placed restrictions on Mr. Hiller that included no prolonged sitting or standing, because "he was unable to perform those activities with any consistency without aggravating his pain."  TT 665:2-7.

188. On June 29, 2005, Dr. Stark next saw Mr. Hiller and examined him.  TT 687:19-21.  Mr. Hiller reported that his condition was the same, he required prescription medication, and he gave Dr. Stark a form to fill out for the public employees' retirement system.  TT 687:23-688:9.  Dr. Stark completed and signed that form on July 5, 2005.

189.  Dr. Stark did not know that Mr. Hiller was off-roading, according to plaintiffs' counsel's representation to the Court.  TT 680:16-18.

190.  Dr. Stark saw Mr. Hiller 8 times over two years, and he noted that Mr. Hiller's condition remained essentially the same during those years.  TT 697:1-7, 705:2-5.

191.  Dr. Stark never made any findings of neurologic compromise.  TT 699:19-21.

192.  Dr. Stark's treatment consisted of prescribing medication to Mr. Hiller.  TT 212:3-7; 710:11-19, 741:1-15.

193.  When he first saw Mr. Hiller in January 2005, Dr. Stark was not sure what pain medicine Mr. Hiller had been taking before that time.  TT 701:11-25.

194.  Dr. Stark prescribed Vicodin during 2005 but later prescribed a stronger narcotic pain medication called Norco.  TT 695:13-19.

195.  Dr. Stark continues to prescribe the medication, which is a narcotic pain medication called Norco, even though Mr. Hiller resides in Texas and even though Dr. Stark has told Mr. Hiller that he cannot write a prescription for narcotic medication to a patient unless they are a resident of California.  TT 710:20-713:25.  Mr. Hiller has lived in Texas since December 2006.  TT 227:10.

196.  Starting in January 2005, Dr. Stark imposed work restrictions on Mr. Hiller.  The restrictions were that Mr. Hiller should not stand for over an hour or sit for over an hour and that he should not lift anything over 25 pounds if he could avoid it.  The restrictions did not change.  TT 211:22-212:22.

197.  Mr. Hiller saw Dr. Clement Jones on one occasion only, on March 2, 2005.  TT 367:19-24, 415:19-22.  Dr. Jones is an orthopedic surgeon.  TT 371:15.  Dr. Jones has never given Mr. Hiller any treatment.  TT 367:25-

368:6.

198.    When he saw Dr. Jones on March 2, 2005, more than one year after the accident, Mr. Hiller told Dr. Jones the big rig truck rear-ended him at 30-40 miles per hour.  TT 368:7-10.

199.    When he saw Dr. Jones on March 2, 2005, Mr. Hiller told him that before the accident he did a variety of activities, including off-roading, but after the accident he could not do those activities.  TT 368:13-17, 398:18-23.  Mr. Hiller did not tell Dr. Jones that he had been driving his Jeep on unpaved surfaces during the sixty days before the March 2, 2005 visit.  TT 368:21-24.

200.    Dr. Jones agreed that an accurate history from the patient is important to his work.  TT 413:3-23.  In reaching the opinions he expressed at trial, Dr. Jones relied to a great extent on the history provided by Mr. Hiller, including that Mr. Hiller had no preexisting injury or treatment.  TT 417:22-418:7.  Dr. Jones did not know about Mr. Hiller's 2002 lumbar strain.  TT 408:4-8.  In fact, he viewed Mr. Hiller as an athletic individual with no previous history of low back pain.  TT 426:15-19.

201.    State Compensation Insurance Fund asked Dr. Jones to render an opinion as to whether surgical intervention was warranted.  TT 373:20-23.  Dr. Jones concluded that if Mr. Hiller's complaints of back pain did not spontaneously resolve within 6 months, Mr. Hiller "should consider" spinal fusion surgery.  TT 392:19-23, 415:1-17.

202.    Mr. Hiller has not had that, or any other, surgery.

203.    Dr. Jones based his work on the April 28, 2004 MRI.  TT 380:5.  He further testified that because he saw Mr. Hiller for the first time on March 2, 2005, nine months after that MRI, Dr. Jones would need to evaluate Mr. Hiller including additional diagnostic studies such as an MRI or discogram, before recommending surgery.  TT 421:23-424:21.

41

204.   Dr. Jones admitted that patients with degenerative conditions in their lower spine with no history of trauma or event, insidiously develop back pain.  TT 424:24-426:19.

205.   Dr. Jones did not know about Mr. Hiller's 2002 lumbar strain.  TT 408:4-8.

206.   Mr. Hiller first saw Dr. Michael Sutro for the first time more than a year after the accident in April 2005.  TT 607:13-14.  On cross-examination, Mr. Hiller could not remember when he saw Dr. Sutro, what he said to Dr. Sutro about the facts of the accident or whether he told Dr. Sutro his Jeep had been totaled in the accident.  TT 506-07.

207.   Dr. Sutro testified that in April 2005 when he first saw Mr. Hiller, Mr. Hiller told him he couldn't drive a jeep off-road.  TT 612:3-4, 630:24-631:1.

208.   Mr. Hiller also told Dr. Sutro in April 2005 that "his estimate" of the impact speed in the collision was 35-40 miles per hour.  TT 629:13-15. Dr. Sutro's testimony was clear that the estimated speed was Mr. Hiller's estimate.

209.   Mr. Hiller reported pain to Dr. Sutro at the time of his April 2005 examination, but otherwise Dr. Sutro did not make any findings of objective abnormality in Mr. Hiller, who was "neurologically intact" and had normal sensation and strength in his lower extremities.  TT 612:14-613:10.

210.   Dr. Sutro next saw Mr. Hiller over a year later in May 2006 and he examined Mr. Hiller again, making essentially the same findings – neurologically intact, with no objective indications of injury such as muscle atrophy or muscle asymmetry, but with complaints by Mr. Hiller of lumbar pain when moving his back.  TT 613:25-615:6.

42

211.   Mr. Hiller reported pain to Dr. Sutro when asked to make voluntary movements during the examination, such as flexion and extension of the spine.  TT 636:4-637:8.

212.   Dr. Sutro testified Mr. Hiller took 2-3 Vicodin per day as of April 2005 but 4-5 Norco 10 per day in May 2006 and the Norco was twice the strenght of opioid as Vicodin.  TT 635:20-636:1.

213.   Before reviewing any records as part of his assignment to consult with the defendant in this case, Dr. Kevin Harrington examined Mr. Hiller for approximately 45 minutes in November 2005.  TT 431:17-432:10.

214.   Dr. Harrington found no objective abnormalities on examination, but he learned about numerous subjective complaints.  TT 432:13-21.  For example, he observed that Mr. Hiller could walk, move in and out of a chair, and get on and off the examination table, while demonstrating a normal range of motion.  TT 432:22-433:5.  When he asked Mr. Hiller to voluntarily move his back, he said he could not do so because he was in too much pain, which Dr. Harrington felt was an exaggerated limitation of mobility.  TT 433:6-25.

215.   Dr. Harrington found no evidence of muscle spasm, muscle tightness, muscle tone, sensory deficit, and otherwise had only objective findings on examination.  TT 434:1-435:23.

216.   In March 2006, after Dr. Harrington's examination, Mr. Hiller went to see Dr. John Lang, an orthopedic surgeon hired by CalPers to evaluate Mr. Hiller for purposes of his application for disability retirement from the CHP, one of 90 examinations Dr. Lang performed for the state in 2006.  TT 724:2-8, 725:4-14.

217.   Dr. Lang saw Mr. Hiller on that occasion only.  TT 737:19.

218.   Dr. Lang obtained a history from Mr. Hiller. TT 726:19-21.  Dr. Lang

43

testified that 90% of medical diagnoses comes from a "good history and a good physical." TT 727:25-728:3.

219. On March 20, 2006, more than two years after the accident, Mr. Hiller told Dr. Lang that his Jeep was totaled in the accident. TT 739:1-10. Dr. Lang was not aware when he wrote his March 20, 2006 report to CalPers that Mr. Hiller was driving the same Jeep that was involved in the accident. TT 745:2-11. Similarly, when he wrote his report, Dr. Lang was not aware Mr. Hiller was driving that same Jeep on unpaved trails for recreation. TT 745:12-15.

220. Mr. Hiller also told Dr. Lang that Dr. Jones and Stark recommended him to consider a two level spine fusion as of March 2005. TT 739:12-18. Neither of the doctors recommended two level spinal fusion as of March 2005. Dr. Lang also understood Drs. Jones and Stark were orthopedic surgeons. Dr. Stark was not.

221. Dr. Lang placed significance on the fact that he was told that five previous physicians evaluated Mr. Hiller before the March 20, 2006 visit. TT 740:3-15.        However, Dr. Lang had "no idea" Mr. Hiller was evaluated by Dr. Harrington in November 2005. TT 742:23-743:3.

222. Dr. Lang concluded Mr. Hiller has discogenic pain because "he didn't get better." TT 729:11-17.

223. Dr. Lang explained that 90-95% of people with a backache get better in about 90 days, "no matter what their cause," but a small percentage who have ongoing pain. TT 729:16-20.

224. Mr. Hiller has no doctor in Texas, where he now lives and has lived since December 2006; he testified he continues to see Dr. Stark whenever he can travel back to San Francisco, which he said is "quite often." TT 527:8-13.

44

225.   Dr. Stark testified he has requested that Mr. Hiller find another doctor in Texas, because he is unable to prescribe the narcotic medication to Mr. Hiller when he is not a resident of California.  TT 713:7-25.

///

///

## VII.   Damages Claims

### A.   Medical Expenses

226.   The parties stipulated that the total medical expenses are $12,550.  Docket #126.

### B.   Lost Past Wages

227.   Plaintiffs concede they had a duty to mitigate damages.

228.   Mr. Hiller could have returned to work in a light duty capacity, including working from home, soon after the accident if he had asked his treating physician for a release.  Dr. Harrington testified that Mr. Hiller was able to return to work approximately four weeks after the accident.  TT 452:1-4. At that point in time, Dr. Harrington concluded after reviewing the 2002 x-rays and the 2004 MRI, Mr. Hiller could have done anything after the accident that he was capable of doing before the accident.  TT 461:2-6, 472:1-9.  Dr. Harrington was the only doctor who reviewed the 2002 x-rays showing Mr. Hiller's pre-existing degenerative back condition.

229.   Mr. Hiller could have returned to CHP working light duty by the end of April 2004, when he was driving his Jeep more than 50 miles a day and on off-road trails.

230.   If Mr. Hiller had returned to light duty in April 2004, he would have mitigated all past wage loss except for one month ($4,750 – per Plaintiff's Exhibit 27 p. 000437) because CHP paid full compensation and benefits for light duty.  TT 137:4.

45

231.  Dr. Stark testified that Mr. Hiller was capable of light duty work when he first saw him in January 2005, and that Mr. Hiller's condition was the same in January 2005 as it was during the four preceding months.  TT 649:10, 699:5-8, 704:18-22.

232.  If Mr. Hiller had returned to work light duty, he would have completely mitigated his past wage loss claim from the time he started working light duty because the CHP paid full pay and benefits for light duty, which could last up to two years.  TT 1065:4-11.

233.  CHP had ample light-duty assignments available to injured employees and was described by Mr. Hiller's treating physician as having a "very flexible" approach toward light duty assignments.  TT 73:10-17 [Gatty]; TT 704:18-22 [Stark].

234.  Mr. Hiller returned to light-duty work at CHP in December 2005.  TT 213:7-10 [Hiller]. When he did so, he received his full pay.  TT 137:4.

235.  According to Mr. Hiller, he returned to light-duty in December 2005, within two to three weeks after his Captain informed him he could return to light-duty work status.  TT 213:11-15.

236.  Captain Lott credibly testified to the contrary, as noted.  She first offered to assign light-duty work to Mr. Hiller in October 2004, when she told Mr. Hiller he could perform light-duty work from his home.  TT 894:1-25. Captain Lott was willing to have the work brought to Mr. Hiller.  TT 894:20-895:4.  Mr. Hiller's response to Captain Lott's offer was that he had to check with his attorney and his doctor.  TT 894:13-14.

237.  Captain Lott had a conversation with Mr. Hiller on February 9, 2005 about working light duty from his home.  TT 898:22-24.  Mr. Hiller specifically told Captain Lott that he needed to speak to his doctor and his attorney and that they would not authorize limited duty for him.  TT 899:9-13; Exhibit E-433.

46

238. During the period of October 2004 to October 2005, when Captain Lott contacted Mr. Hiller on at least a monthly basis to get him back to light duty, his response was always the same, namely that he "needed to speak with his attorney and his doctor." TT 895:23-896:3.

239. Captain Lott told Mr. Hiller he "should be talking to his doctor. The doctor's the one that makes the decision on his medical return to work, not the attorney." TT 921:14-21.

240. Then, in October 2005, when all of Mr. Hiller's accrued compensated vacation time and other time on the books and benefits expired, he finally requested his doctor to release him to limited duty so that he could come back to work at CHP. TT 896:4-11. That was the first time Mr. Hiller requested a light duty release from his doctor. TT 526:3-5.

## C.     Lost Future Wages

241. Shawn Hiller seeks an award encompassing 25 years of future lost wages, premised on the assumption he would have worked for the CHP until 2029.

242. Mr. Hiller worked for two months as a CHP patrolman before the accident, according to his expert economist. TT 790:19-24, 820:23-821:5. As noted, Mr. Hiller testified the period was closer to six months.

243. Mr. Hiller's vocational rehabilitation expert Carol Hyland assumed Shawn Hiller would work until age 55 as a CHP patrolman, if the accident had not occurred. Mr. Hiller's expert economist Robert Johnson incorporated Carol Hyland's assumption in his damages calculations. TT 788:22-818:22.

244. As for medical evidence to support Mr. Hiller's claim for future economic damages, there was none. Dr. Harrington reviewed Mr. Hiller's lumbar spine x-rays from 2002 and the April 2004 MRI. TT 436:2-14. He

47

1    compared the condition of Mr. Hiller's lumbosacral spine in the two sets
2    of diagnostic studies and concluded that the 2002 x-rays showed "early
3    relatively minor degenerative changes which essentially are identical to
4    what was seen in the MRI two years later."  TT 436:15-24.

245.   The medical evidence was that Mr. Hiller's preexisting degenerative disc
       disease would have limited his ability to function as a CHP patrolman
       within ten years, even if the February 2004 accident had not happened.
       TT 452:5-15.

246.   No other medical expert offered testimony at trial about the comparison
       between the 2002 x-rays and the 2004 MRI.

247.   The Court finds that a period of 2-6 months of previous employment with
       CHP is an insufficient basis for Mr. Hiller's claim of future lost wages
       damages until 2029.

248.   Apart from the speculative nature of the claim, defendant introduced
       evidence to support its claim Mr. Hiller failed to mitigate his losses.

249.   Defendant's vocational rehabilitation expert Andrew M. O'Brien met with
       Mr. Hiller in an interview, at which plaintiffs' attorney was present.  TT
       925:8-12.  Other than the light duty work from December 2005 to May
       2006 and attempting two classes at San Mateo Community College,
       Shawn Hiller told Mr. O'Brien he hadn't done anything in the way of
       looking for work.  TT 928:10-19.

250.   Mr. O'Brien asked Mr. Hiller about his interest in investigative-type work
       with another employer and Mr. Hiller thought it was a possibility but he
       had done no research and had no information about what would be
       necessary steps to becoming a private investigator or claims adjuster.  TT
       928:2-9.

251.   Mr. O'Brien reviewed Mr. Hiller's work restrictions, as stated by Dr.

48

Barber in May 2005, and concluded Mr. Hiller could have been working light duty for CHP no later than May 2005 and for two years thereafter. TT 930:7-20.

252. He also concluded that Mr. Hiller's subjective reports of complaints in the interview, and the medical records, were significantly more severe than reported in Dr. Barber's report. TT 929:7-24.

253. Mr. O'Brien opined there were jobs within CHP that Mr. Hiller could have performed, assuming he could no longer be a CHP patrolman, including the position of dispatcher. TT 930:21-931:4.

254. Mr. Hiller told Mr. O'Brien that, based on three days prior experience, found the work of a dispatcher too boring and, essentially, water torture. TT 939:17-25. Mr. O'Brien opined that this was not sufficiently flexible, because while working as a dispatcher, Mr. Hiller could have continued to work in law enforcement, maintained the generous service pension benefits of the CHP, and he could have been in position to take advantage of other future opportunities in government work. TT 946:11-23.

255. Mr. O'Brien concluded Mr. Hiller did not have a financial incentive or motivation to return to work at the CHP because the alternative position of dispatcher would have paid less, other government positions would have both paid less and had a lesser retirement benefit, but he could later seek employment with any private employer and not impact his retirement. TT 940:1-22.

256. The Court granted defendant's motion to reopen discovery and permit the defense experts to supplement their reports. As a result, defense vocational rehabilitation expert Andrew M. O'Brien testified at trial that Mr. Hiller's off-roading activities and his work for Jeepers and Creepers confirmed concerns about secondary gain and financial incentives, and that Mr. Hiller could have gone back to work earlier than he did if he had

pursued light duty or alternate employment with the CHP.  TT 947:2-18.

257.  Mr. Hiller's expert in vocational rehabilitation, Carol Hyland, assumed that Mr. Hiller would not be able to work as CHP officer.  TT 123:10-13. Carol Hyland's conclusions regarding Mr. Hiller's vocational options were based in whole on the written medical evaluations by physicians.  TT 146:8-147:3.  Carol Hyland did not even ask Mr. Hiller about efforts he had made to find other employment.  TT 136:23.

258.  Ms. Hyland met with Mr. Hiller as part of her work in this case.  TT 124:1-2.  They met on that one occasion only, which was in May 2005. TT 131:18-23.

259.  After meeting Mr. Hiller, Ms. Hyland concluded he could work after the accident and she described alternate employment as either a private investigator or as an insurance claims adjuster.  TT 125:22-127:15.

260.  Ms. Hyland agreed that plaintiffs had a duty to mitigate their damages. TT 135:5.  She believes that looking for an alternative employment position is a "full-time" job.  TT 135:8.  She agreed that within two to four months, Mr. Hiller could have found a position in private investigating or detective work.  TT 136:11-20.

261.  Mr. O'Brien agreed with Carol Hyland's conclusions that Mr. Hiller could work as a private investigator or claims adjuster.  TT 941.  As a private investigator, because of his law enforcement experience he did not need additional training and Mr. Hiller could have started a job search no later than May 2005.  TT 941:2-15.  Within approximately 90 days, Mr. Hiller could have found a position as a private investigator.  TT 942:4-7. Because of his experience in law enforcement, Mr. O'Brien concluded Mr. Hiller would have begun working at the median wage rate.  TT 941:16-25.

262.  If he took college courses offered through programs designed for people

50

who also work, such as University of Phoenix or National University, Mr. Hiller could have completed his college degree in four years (by 2009) at a total cost of $40,000.  TT 942:8-943:3.

263.   Upon completion of his degree, Mr. Hiller could have become an insurance claims adjuster, and again, he could have entered that position at the median wage rate due to his previous experience working in law enforcement.  TT 943:4-945:13.

264.   Mr. O'Brien concluded Mr. Hiller's behavior indicated he was not motivated to return to work.  TT 945:14-948:9.  He was physically capable, according to Dr. Barber's report, since at least May 2005, to return to work, but he did not do so until December 2005.  TT 945:18-21.

265.   In his interview with Mr. O'Brien, Mr. Hiller indicated he hadn't looked for work, hadn't considered looking for work, didn't know what kind of work he could do, and was unclear on whether to return to school to pursue an education.  TT 945:21-25.

266.   The first time Mr. Hiller applied for any job other than at CHP was after he moved to Texas in 2006.  TT 526:6-9.  At the time of trial, he had been a security guard for Wal-Mart in Texas for three or four weeks and he testified he was under orders from his manager to "kill them with kindness" in reference to suspected shoplifters, not to use force to apprehend them.  TT 592:3-594:4.

267.   Mr. Hiller made no attempt to find an alternative position with the CHP. TT 526:10-12.  Ms. Hyland was not sure if Mr. Hiller could have become a CHP dispatcher.  TT 140:5.  Ms. Hyland testified that dispatchers at the CHP earned a range of $3,097 to $3,762 per month.  TT 140:14-17. Vocational rehabilitation expert Andrew M. O'Brien concurred with Ms. Hyland. TT 939:3-6.

268.   If Mr. Hiller had sought a position as a CHP dispatcher instead of retiring

in May 2006, he would have earned close to $3,762 per month given his prior law enforcement experience.  This amount is approximately $1,000 per month lower than his CHP patrolman pay.  Plaintiff's Exhibit 27.  Accordingly, under this analysis, the future wage loss will be equal to approximately $276,000, before reduction to net present value ($12,000 per year x 23 years (from 2006 to 2029)), or approximately $190,246 disounted to present value with a 2% net discount rate.  As explained below, there would be no loss of pension to Mr. Hiller if he became a CHP dispatcher.

269.   If Mr. Hiller had diligently pursued new employment as either a claims adjuster or private investigator, his total future wage loss, reduced to present value would be $203,706.  TT 987:7-20.  This sum is the result of Dr. Ogus' future wage loss calculation of $159,609 plus future taxes of $44,097.  TT 974:14-23.

270.   Dr. Ogus calculated wage loss ending in 2014, because after that date, the earnings from Mr. Hiller's new claims adjuster position would exceed those of a CHP officer.  TT 987:7-20.

**D.      Loss of pension claim**

271.   In late March 2005, Mr. Hiller applied for disability retirement from the CHP.  TT 368:25-369:2.  When he applied, he believed it would take less than six months to process.  TT 369:3-5.  When he went to see Dr. Stark on June 29, 2005, he brought the forms he needed to have Dr. Stark complete for the retirement application.  TT 687:19-688:5.  Mr. Hiller described this appointment with Dr. Stark in an email the night before as "my CHP crap."  Exhibit AAA-210.

272.   Based on CHP return-to-work coordinator Robin Blair's testimony, Mr. O'Brien concluded that if Mr. Hiller sought alternative employment in CHP as a dispatcher, he would have retained the safety classification for

purposes of his service pension.  TT 931:5-12.

273.  Given Robin Blair's testimony (TT 1065:23-1066:13), Ms. Hyland's understanding that a CHP dispatcher did not have a safety designation on their retirement (TT 140:18-22) is erroneous.

274.  Assuming Mr. Hiller obtained private employment as an insurance adjuster or private investigator, he may have a pension loss.  The future wage loss is speculative, and so is the future lost pension claim as it assumes Mr. Hiller would have no retirement package with a private employer.  However, even assuming there would be a pension loss, the lost pension is at most valued at $278,000.  This amount is the difference between the present value of the lost service connected pension ($537,000) according to Mr. Hiller's economist (TT 811:11) and the present value of Mr. Hiller's disability retirement pension from 2029 to the end of his life expectancy in 2051 ($259,000).  TT 975:24.  Rotolo v. Chevrolet v. Superior Court, 105 Cal.App.4th 242, 247 (2003) ("[T]here is no justification for allowing [plaintiff] to claim that he has been 'damaged' by the loss of his regular pension when he is actually receiving the disability payments.")

**E.     General Damages**

275.  The Court finds that Mr. Hiller's writings in the web postings and e-mails introduced at trial do not support a finding that he was in unrelenting, disabling pain from April 2004 to the present.  Instead, these writings establish that Mr. Hiller actively pursued vigorous recreational activities and worked for a friend's business, all of which he did not disclose to any doctor or retained expert, or to the defendant during discovery.

276.  Apart from the nondisclosure issue, Mr. Hiller's web postings reveal conduct by him inconsistent with his claim of constant, unrelenting and disabling lower back pain after the accident.

53

277. This evidence undermines his claim in the same fashion as would surveillance evidence. <u>Culbertson v. R. D. Werner Co., Inc.</u>, 190 Cal.App.3d 704, 235 Cal.Rptr. 510 (1987) (jury verdict for defendant in personal injury action involving a claim of ruptured back disc, where plaintiff demanded $1.5 million in a case involving $35,000 workers compensation benefits, based on surveillance evidence showing plaintiff involved in vigorous activity that contradicted his claim).

**F.    Loss of Consortium**

278. After the accident, Stacey Hiller did not take any time off of her work to be at home with her husband.  TT 1076:8-12.

279. In the three months after the accident while she was still working, Stacey Hiller left the house for work at 7:45 a.m. and returned at 6:15 p.m.  TT 1076:8-21.

280. After the accident, Stacey Hiller testified that Mr. Hiller played the guitar almost every night, spent time on the computer, and played video games.  TT 1076:22-1076:25.

281. Stacey Hiller testified that she and her husband have not had any marriage counseling, emotional counseling, or treatment or counseling for any problem with their sexual relationship.  TT 1081:25-1082:6.

282. Stacey Hiller stated she did not know how to answer a question about the future of her marriage, but she confirmed that at her deposition, she said she had no reason to say she and Mr. Hiller would get separated or divorced.  TT 1082:12-18.

283. Stacey Hiller testified that Mr. Hiller has been an excellent father to their daughter.  TT 1082:19-1083:1.

284. Stacey Hiller testified that Mr. Hiller has emotionally supported her 95% of the time, after the accident.  TT 1081:22-24.

285.   Stacey Hiller testified on direct that before the February 2004 accident, she and her husband split chores around the house equally.  TT 872:17-23. She further testified that after the accident she does the majority of the household chores, and her husband tries to help her, but cannot without experiencing pain, citing one particular incident when he fell to his knees in pain trying to take out the trash.  TT 882:4-24.  When he met with vocational rehabilitation expert Andrew M. O'Brien, by contrast, Mr. Hiller stated that his wife essentially did everything in the home both before and after accident with the exception of taking out the trash and perhaps their daughter's diapers.  TT 927:9-18.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSIONS OF LAW

1.      Under California law, Mr. Hiller must prove, by a preponderance of the

evidence, each element of his claim of negligence: duty, breach of duty,

causation, and damages.  Ting v. United States, 927 F.2d 1504, 1513 (9th

Cir. 1991) (citing United States Liability Ins. Co. v. Haidinger-Hayes,

Inc., 1 Cal.3d 586, 594 (1970)).  Plaintiffs claim the accident caused

medical expenses to date, lost wages to date, lost future wages for a 25

year period in the future, lost service pension accrued as of 2029, lost past

and future general damages, and lost past and future loss of consortium to

Mrs. Hiller.

2.      With respect to causation, each plaintiff must show that the defendant's

conduct was the probable, not merely a possible, cause of the injury.

Jones v. United States, 933 F.Supp. 894, 900 (N.D. Cal. 1996), citing

Jones v. Ortho Pharmaceutical Corp., 163 Cal.App.3d 396, 402-03 (1985)

and Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1320

(9th Cir. 1995).

3.      Causation must be founded upon expert testimony, not inferred from the

trier of fact's consideration of the totality of the circumstances, unless

those circumstances include the requisite expert testimony on causation.

See Jennings v. Palomar Pomadero Health Systems, Inc., 114 Cal.App.4th

1108 (2004); Cottle v. Superior Court, 3 Cal.App.4th 1367, 1385 (1992).

4.      Opinion testimony should be judged like any other testimony.  The trier of

fact may accept it or reject it, and give it as much weight as it deserves,

considering the witness' education and experience, the reasons given for

the opinion, and all the other evidence in the case.  Ninth Circuit Model

Jury Instruction 3.7.

5.      Regarding witnesses, the trier of fact may believe everything a witness says, or part of it, or none of it.  In considering the testimony of any witness, the trier of fact may take into account:

>       (1) the opportunity and ability of the witness to see or hear or know the things testified to;

>       (2) the witness' memory;

>       (3) the witness' manner while testifying;

>       (4) the witness' interest in the outcome of the case and any bias or prejudice;

>       (5) whether other evidence contradicted the witness' testimony;

>       (6) the reasonableness of the witness' testimony in light of all the evidence; and

>       (7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  Ninth Circuit Model Jury Instruction 3.6.

6.      The interests, motives, and biases of witnesses at trial may be shown by evidence of financial interest or financial inducement in the form of past or future payments that are connected to or dependent upon the outcome of the trial.  Evidence of these payments is admissible to show malingering or disincentive to return to work. Lafayette v. County of Los Angeles, 162 Cal.App.3d 547, 551-52 (1984) (evidence of social security benefits admissible to determine plaintiff's motivation to seek employment and credibility); Garfield v. Russell, 251 Cal.App.2d 275, 278-79 (1967) ("Evidence that a plaintiff is being wholly or partially compensated for her medical expenses -- or perhaps even making money every time she sees her doctor -- may obviously be relevant on her

motives in seeking medical help and her credibility as a witness"); Stathos v. Lemich, 213 Cal.App.2d 52, 56-57 (1963) (defendant allowed to introduce otherwise inadmissible evidence to impeach self-serving testimony).  The only requirements are that the party seeking to present evidence of the collateral source can show a proper relationship between the evidence and an issue in the case, and that the court weigh the probative value of the evidence against any potential prejudice.  Hrnjak v. Graymar, Inc., 4 Cal.3d 725, 733 (1971) (admission of collateral source evidence to show malingering permitted after weighing any potential prejudice when evidence is of substantial probative value); Blake v. E. Thompson Petroleum Repair Co., 170 Cal.App.3d 823, 831 (1985) (general California Rule permitting evidence in court's discretion).

7.     The Court finds that the evidence at trial established Mr. Hiller's disincentive to return to work and malingering: (1) he did not follow the Sequoia emergency room physician's instructions to return to work in two days and to return to the occupational health clinic for follow up, but instead he sought treatment from a doctor recommended by his area representative because he did not want a "state doctor"who would return him to work in two days; (2) he did not seek any medical treatment for 19 days after the accident even though he contends he was in unrelenting pain during this period; (3) he retained an attorney within six weeks of the accident, and while reporting to his selected doctor that he was in incapacitating pain, he was driving his Jeep an average of 50 miles a day in April 2004, and admittedly on off-road trails; (4) he exaggerated the facts of the accident to every doctor he went to see over the following two years and informed them his Jeep was totaled in the accident when he had no reasonable basis in fact to make such a statement (Lang testimony re 3/20/06 examination); (5) he informed his commander, Captain Lott, that he had to check with his lawyer and his doctor about returning to work

58

light duty starting in October 2004, but he did not request a light duty release from his doctor for another year; (6) his condition was stable and unchanged after September 2004 according to Drs. Jones and Stark and he could have been working light duty for CHP; (7) he made a multimillion dollar tort claim before any doctor told him he was permanently precluded from CHP work; (8) he could have been released to light duty in 2004, but request a release to light duty from any doctor until October 2005, after all "4800" and other comp time run out; (9) he was doing the equivalent of light duty work when answering phones from home for Jeepers & Creepers for 6 months in 2005, which work he did not disclose to CHP, the doctors, any expert, or in discovery; (10) his description of his physical activity level in on-line forum differs from what he told his doctors, which activity he did not disclose to CHP, the doctors, the experts, or in discovery.

8.     Regarding damages, plaintiffs bear the burden of proving by a preponderance of the evidence each item of damages sought at trial.  Ninth Circuit Model Jury Instruction 7.1.

9.     This case involves principally claims of future damages.  Under California law, future damages that are speculative should not be awarded.  Cal. Civ. Code §3283 ("Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future."); Piscitelli v. Friedenberg, 87 Cal.App.4th 953, 989, 105 Cal.Rptr.2d 88 (2001) (Damages cannot be speculative, and are limited to those that are "reasonably certain to have been realized but for the wrongful act of the opposing party."); Mozzetti v. City of Brisbane, 67 Cal.App.3d 565, 577 (1977) ("It is black-letter law that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery"). Bellman v. San Francisco High School Dist., 11 Cal.2d 576, 588 (1938) ("The [trier of fact] may not

consider consequences which are only likely to occur;" plaintiff's medical testimony failed "to show any certainty of serious permanent injury").

10. Plaintiffs had a duty to mitigate their damages and cannot recover losses they could have avoided through reasonable efforts.  <u>Thrifty-Tel, Inc. v. Bezenek</u>, 46 Cal.App.4th 1559, 1568 ("A plaintiff has a duty to mitigate damages and cannot recover losses [he] could have avoided through reasonable efforts."); <u>Shaffer v. Debbas</u>, 17 Cal.App.4th 33, 41 (1993) (a plaintiff who suffers damage as a result of a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses that could have been avoided); <u>Wilson v. Union Pacific Railroad Co.</u>, 56 F.3d 1226, 1232 (10th Cir. 1995) ("An unemployed plaintiff who is able to look for work does not satisfy his duty to mitigate by waiting passively for employment to be offered.  The opportunity to mitigate is not merely the opportunity to accept a job, but the opportunity to seek appropriate work when one is able to do so.").

**I.     Specific Items of Damages Claimed By Plaintiffs**

**A.     Medical Expenses**

11. Mr. Hiller claimed a total of $12,550 in medical expenses incurred as a result of the accident.  The parties reached a stipulated agreement during trial that $12,550 was the total amount of medical expenses.

**B.     Lost Past Wages**

12. Mr. Hiller claimed lost wages from the date of the accident to the trial. His claim fails for lack of evidence.  Given the medical testimony and evidence regarding his soft tissue injury and Mr. Hiller's actual activities in the weeks following the accident, Mr. Hiller could have returned to work at full pay for the CHP within 4-6 weeks of the February 24, 2004 accident.   Thus, Mr. Hiller's past wage loss is at most $7125 ($4750 per month x 1.5 months).  Plaintiff's Exhibit 27 p. 000437.

**C.    Lost Future Wages**

13.    Mr. Hiller claimed that as a result of the accident, he could not return to
work at the CHP in any capacity, including dispatcher, and therefore, he
should recover $1.3-$1.6 million, representing lost future wages, after
mitigation, covering the next 25 years.

14.    Mr. Hiller's medical witnesses testified he was precluded from performing
some of the tasks of a CHP patrolman, which they attributed to the
accident, solely, relying on the statements of Mr. Hiller about his pain, his
condition, his physical limitations, and his history.  The Court finds that
due to the credibility findings adverse to Mr. Hiller stated above, he failed
to prove by a preponderance of the evidence that he is precluded now, or
has been for the past three years, from working as a CHP patrolman.
Plaintiffs' presentation proved only that he told the doctors certain
incorrect and exaggerated facts, that the doctors did not have the true
facts, that as a result, the doctors relied on Mr. Hiller's statements and
credited them as true when in fact they were not, and that the doctors
reached conclusions based on erroneous information.

15.    In addition, Mr. Hiller failed to carry the burden of proof by a
preponderance of the evidence for other reasons.  Due to the speculative
nature of the future damages claim, Mr. Hiller failed to offer any evidence
to support his claim that he should be awarded 25 years of future income.
In fact, Mr. Hiller offered no credible evidence, medical or otherwise, that
he would have remained in the CHP for the 25 year period in the future.
The only medical evidence at trial established Mr. Hiller had a preexisting
degenerative abnormality of his lumbar spine that would have precluded
him from working as a CHP patrolman within a period of at most 10
years.  Because he had been on active duty with CHP for no more than six
months at the time of the accident, the Court finds Mr. Hiller's claim for

future damages is speculative, and therefore not compensable.  Cal. Cal.
Civ. Code §3283 ("Damages may be awarded, in a judicial proceeding, for
detriment resulting after the commencement thereof, or certain to result in
the future."); <u>Piscitelli v. Friedenberg</u>, 87 Cal.App.4th 953, 989, 105
Cal.Rptr.2d 88 (2001) (Damages cannot be speculative, and are limited to
those that are "reasonably certain to have been realized <u>but for</u> the
wrongful act of the opposing party."); <u>Mozzetti v. City of Brisbane</u>, 67
Cal.App.3d 565, 577 (1977) ("It is black-letter law that damages which
are speculative, remote, imaginary, contingent or merely possible cannot
serve as a legal basis for recovery"); <u>Bellman v. San Francisco High
School Dist.</u>, 11 Cal.2d 576, 588 (1938) ("The [trier of fact] may not
consider consequences which are only likely to occur;" plaintiff's medical
testimony failed "to show any certainty of serious permanent injury").

16.    In addition, Mr. Hiller could have mitigated his future lost wages, if any,
by seeking employment within the CHP as a dispatcher or with another
employer as a private investigator or claims adjuster, starting in
September 2004 when his condition stabilized.  He did nothing to look for
any other work until after he moved to Texas in December 2006.

17.    Both Mr. Hiller's vocational rehabilitation expert and the United States'
vocational rehabilitation expert agree that Mr. Hiller was capable of being
either an insurance adjuster or a private investigator.  Thus, to mitigate his
damages, which he was required to do, Mr. Hiller could have either: (1)
immediately started working as a private investigator; or (2) begun taking
college courses to obtain the skills for an insurance adjuster job while also
working to mitigate his lost earnings.  <u>Thrifty-Tel, Inc. v. Bezenek</u>, 46
Cal.App.4th 1559, 1568 (1996) ("A plaintiff has a duty to mitigate
damages and cannot recover losses [he] could have avoided through
reasonable efforts.") Despite being informed of these career options in
2005, Mr. Hiller has done neither.

18.  Due to the inherent credibility problems in Mr. Hiller's case, his lack of effort to mitigate, and the speculative nature of his future damages calculations, the Court finds that the appropriate award of lost future wages is zero.

**D.     Lost future pension**

19.  Due to the inherent credibility problems in Mr. Hiller's case, his lack of effort to mitigate, and the speculative nature of his future damages calculations, the Court finds that the appropriate award of lost future pension is zero.  Mr. Hiller could have sought alternate employment or retraining, become a CHP dispatcher, sought occupational therapy (which the ER doctor recommended he do), or made other reasonable efforts to mitigate his alleged damages, but failed to do so.  Specifically, if Mr. Hiller had sought work within CHP as a dispatcher, he would have maintained the safety classification for his pension.  TT 1065:23-1066:13.

20.  Rotolo Chevrolet v. Superior Court, 105 Cal.App.4th 242 (2003), is the only California case that addresses the issue of whether a disability retirement pension is a collateral source when the plaintiff claims loss of a future "regular" retirement pension.  In Rotolo, the California court of appeal held that it was reversible error for the trial court to exclude evidence of plaintiff's disability retirement pension as a collateral source when plaintiff also sought to recover loss of a future "regular" retirement pension.  Id. at 248.  The court of appeal reasoned that it would be inequitable for the plaintiff to claim that he lost his retirement pension because of the injury, when in fact the injury merely caused him to receive a disability pension instead.  Id. at 246-47.  The Rotolo court did recognize, however, that the plaintiff might be able to recover for the amount by which his regular pension would have exceeded his disability pension.  Id. at 248.  Here, just as in Rotolo, Mr. Hiller claims lost future

63

wages, loss of his "regular" retirement benefits, and at the same time, seeks to exclude evidence of the substantial disability retirement benefits he actually will receive. Specifically, under the terms of his disability retirement, which CalPERS has approved, Plaintiff has been receiving and will receive the monthly sum of $2843, tax free, for the rest of his life along with full medical and dental benefits.  Discounted to present value, the total amount of disability benefits that Plaintiff will receive from CalPERS from 2029 to the end of his life expectancy in 2051 is $259,000. Thus, just as in <u>Rotolo</u>, this amount at a minimum would need to be deducted from any award for loss of future pension.

**E.      General Damages**

21.    Mr. Hiller seeks $2 million.  In light of the above findings regarding Mr. Hiller's credibility and his actual activities after the accident, the Court is not persuaded.  A reasonable and appropriate award of general damages to Mr. Hiller in this case is $37,650, which is three times the agreed amount of medical expenses.

**F.      Loss of Consortium**

22.    Under California law, the spouse of an injured plaintiff has a separate claim for loss of consortium.  The spouse has the burden of proof to show that she has been harmed by the injury to her spouse.  Thus, plaintiff Stacey Hiller may be compensated for: (1) The loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support; and (2) the loss of the enjoyment of sexual relations or the ability to have children.  <u>See</u> Judicial Council California Civil Jury Instruction 3920.  She may not be compensated for: (1) The loss of financial support from the injured spouse, (2) Personal services, such as nursing, that the spouse has provided or will provide to the injured spouse, or (3) Any loss of earnings that the spouse has suffered by giving up

employment to take care of the injured spouse.  <u>Id.</u>  Stacey Hiller's claim, however, remains vague and was not supported at trial by detailed or specific credible evidence, as discussed above.

23. Plaintiffs seek $200,000 for Stacey Hiller's loss of consortium claim.  The Court finds the appropriate award is $18,750, or roughly one-half the amount of Mr. Hiller's general damages.

**G.   Future Medical Expenses**

24. Given that Mr. Hiller's own treating doctor, Dr. James Stark, and retained expert, Dr. Sutro, have not recommended further treatment of Mr. Hiller's alleged injuries, and have concluded that Mr. Hiller is not a surgical candidate, no award of any future medical expenses is warranted.

**II.   Award**

As a result of all the foregoing, the Court makes the following award to Plaintiffs:

25. <u>Past Medical Expenses</u>          **$12,550**

26. <u>Future Medical Expenses</u>        **$0**

27. <u>Past Wage Loss</u>                 **$7,125**

28. <u>Loss of Future Wages</u>           **$0**

29. <u>Pension loss</u>                   **$0**

30. <u>Plaintiff Shawn Hiller's General Damages</u>          **$37,650** ($12,550 x 3).

31. <u>Plaintiff Stacey Hiller's Non-Economic Damages</u>   **$18,750**

32. TOTAL:                                **$76,075**

33. The parties stipulated that the amount of the United States' lien in this case is $88,590.68, but the matter of how the lien is to be applied is reserved for further proceedings consistent with this Order.  Stipulation; Docket #126, ¶5.

1    IT IS SO ORDERED.

2

3    September 28, 2007

4                                               The Honorable Saundra Brown Armstrong

5                                               UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28